BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

*Attorneys for Plaintiff*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC BOWERS, Derivatively on Behalf of Nominal Defendant GINKGO BIOWORKS HOLDINGS, INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>JASON KELLY, MARK DMYTRUK, HARRY E. SLOAN, RESHMA SHETTY, ARIE BELLDEGRUN, MARJIN DEKKERS, CHRISTIAN HENRY, RESHMA KEWALRAMANI, SHYAM SANKAR, ELI BAKER, SCOTT M. DELMAN, JOSHUA KAZAM, ISAAC LEE, TIMOTHY LEIWEKE, DENNIS A. MILLER, and LAURENCE E. PAUL<br><br>                    Defendants,<br><br>        and<br><br>GINKGO BIOWORKS HOLDINGS, INC.,<br><br>                    Nominal Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Eric Bowers ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Ginkgo Bioworks Holdings, Inc. ("Ginkgo" or the "Company"), against its current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Ginkgo, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Bernstein v. Ginkgo Bioworks Holdings, Inc., et al.,* Case No. 4:21-cv-08943-KAW (N.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Ginkgo against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least May 11, 2021 and October 5, 2021, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.      Ginkgo is a biotechnology company incorporated in Delaware and headquartered in Boston, Massachusetts whose functional predecessor ("Legacy Ginkgo") was founded in 2008. The Company's business involves genetic engineering.  Specifically, the Company purports to re-engineer yeast so that it produces chemicals that can be used in various products.

3.      Ginkgo primarily generates revenue through its product sales, partnerships, and licensing agreements with the use of its two core assets: Foundry and Codebase.  Ginkgo uses the Foundry, a microbe engineering lab, to provide R&D services to other companies.  The Codebase is the collection of biological parts and data gained from the Company's efforts in the Foundry.

4.      Soaring Eagle Acquisition Corp. ("SRNG") was operated as a special purpose acquisition company ("SPAC"), which is a development-stage corporation listed on a stock

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

exchange with no particular business plan or purpose other than to acquire an unidentified private company, thus making it public without going through the traditional public offering process.

5.    SRNG completed its initial public offering ("IPO") on February 26, 2021, generating $1,725,000,000 in gross proceeds.  SRNG simultaneously privately sold 19,250,000 warrants to Eagle Equity Partners III, LLC for $1.50 per warrant, generating an additional $28,875,000 in proceeds.

6.    On May 11, 2021, SRNG and Legacy Ginkgo announced that they had entered into a merger agreement (the "Merger Agreement"), pursuant to which Legacy Ginkgo would merge with a subsidiary of SRNG called SEAC Merger Sub Inc. ("Merger Sub"), and SRNG would rename itself Ginkgo Bioworks Holdings, Inc.

7.    On May 14, 2021, SRNG filed a registration statement in connection with the proposed business combination on Form S-4 with the SEC (the "Registration Statement").

8.    On August 13, 2021, SRNG filed a Proxy Statement with the SEC (the "Proxy Statement"), calling on its shareholders to, among other things, approve numerous proposals necessary to consummate the proposed business combination.

9.    In order to solicit the requisite shareholder approval for the proposed business combination, members of SRNG's Board issued false and misleading statements in the Registration Statement and Proxy Statement, touting Ginkgo's Foundry revenue, partnership agreements, and general business prospects while concealing the Company's dependence on related-party revenues.

10.    On September 16, 2021, SRNG, Merger Sub, and Legacy Ginkgo effectuated the business combination (the "Merger").  The term "Ginkgo," when used alone in this Complaint, refers to business of Legacy Ginkgo prior to the Merger as well as the continuation thereof as Ginkgo Bioworks Holdings, Inc. following the Merger.

11.    On October 6, 2021, the truth emerged when Scorpion Capital ("Scorpion") issued a report (the "Scorpion Report") characterizing Ginkgo as a "colossal scam" and a "shell game" that was highly reliant on related party transactions.  Specifically, the report alleged that the overwhelming majority of the Company's revenues were derived from circular transactions with

entities that were funded and/or controlled by Ginkgo.

12.     On this news, the price of Ginkgo's common stock declined 11.6% to close at $10.59 per share on October 6, 2021.

13.     In Ginkgo's quarterly report filed on Form 10-Q with the SEC on November 15, 2021, the Company reported that it had received an inquiry from the United Stated Department of Justice (the "DOJ") related to the allegations in the Scorpion Report.

14.     Further, as a result of the foregoing, the Securities Class Action was filed against the Company, Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller, Paul, Kelly, Shetty, Belldegrun, Dekkers, Henry, Kewalramani, and Sankar, exposing the Company to massive class-wide liability.

15.     On October 5, 2023, Plaintiff, through his counsel, made a demand on the Board to investigate and remedy the violations of law described herein (the "Litigation Demand").  *See* Exhibit A.  Upon receiving the Litigation Demand, the Board had an affirmative duty under Delaware law to conduct a good faith, reasonable, and objective investigation into the allegations in the Litigation Demand and to reach a good faith, reasonable, and objective conclusion regarding the potential claims detailed in the Litigation Demand. However, to date, the Board has failed to undertake any of the actions detailed in the Litigation Demand in indefinite deference to other litigation. The only possible conclusion is that the Board acted in bad faith and in breach of its fiduciary duties in refusing to investigate and consider the Litigation Demand, and in fact has intended to reject the Litigation Demand from the outset. Because the Board has constructively and wrongfully refused the Litigation Demand, Plaintiff now commences this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused Gingko.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.  Moreover, the Company maintains an office in this District.

**PARTIES**

*Plaintiff*

21.     Plaintiff is, and has been at all relevant times, a shareholder of Ginkgo.

*Nominal Defendant*

22.     Nominal Defendant Ginkgo is incorporated under the laws of Delaware with its principal executive offices located at 27 Drydock Avenue, 8th Floor, Boston MA 02210.  The Company also maintains an office in Emeryville, California. Ginkgo's common stock and warrants are traded on the New York Stock Exchange ("NYSE") under the ticker symbols "DNA" and "DNA.WS," respectively.

23.     Ginkgo offers three classes of stock.  Shares of the Company's Class A common stock carry one vote per share; shares of the Company's Class B common stock carry ten votes per share; shares of the Company's Class C common stock do not have voting rights.  Each share of Class B common stock is convertible at the option of the holder into one share of Class A common stock.  Additionally, shares of Class B common stock generally convert automatically into Class A common stock upon the holder of such shares ceasing to be a Company director or employee.

*The Ginkgo Defendants*

24.     Defendant Jason Kelly ("Kelly") is one of the founders of Legacy Ginkgo, and he served as Chief Executive Officer ("CEO") and as a director of Legacy Ginkgo from 2008 until the Merger.  After the Merger, Kelly continued to serve in the same roles at the Company.  According to the Company's public filings, Kelly received a staggering $364,186,973 in 2021 in compensation from the Company.

25.     Defendant Mark Dmytruk ("Dmytruk") served as Legacy Ginkgo's Chief Financial Officer ("CFO") from November 9, 2020 until the Merger.  After the Merger, Dmytruk continued to serve in the same role at the Company.  According to the Company's public filings, Dmytruk received $40,068,678 in 2021 in compensation from the Company.

26.     Defendant Reshma Shetty ("Shetty") is one of the founders of Legacy Ginkgo, and she served as President, Chief Operating Officer, and as a director of the Company from 2008 until the Merger.  After the Merger, Shetty continued to serve in the same roles at the Company.  According to the Company's public filings, Shetty received a staggering $364,186,973 in 2021 in compensation from the Company.

27.     Defendant Marjin Dekkers ("Dekkers") served as Chairman of the Board of Legacy Ginkgo from April 2019 until the Merger.  After the Merger, Dekkers continued to serve in the same role at the Company.  According to the Company's public filings, Dekkers received $30,460,623 in 2021 in compensation from the Company.

28.     Defendant Christian Henry ("Henry") served as a member of the Board of Legacy Ginkgo from November 2016 until the Merger.  After the Merger, continued to serve as a director of the Company.  Henry serves as Chair of the Board's Audit Committee and as a member of the Compensation Committee.   According to the Company's public filings, Henry received $20,022,517 in 2021 in compensation from the Company.

29.     Defendant Shyam Sankar ("Sankar") served as a member of the Board of Legacy Ginkgo from December 2015 until the Merger.  After the Merger, Sankar continued to serve as a director of the Company.  Sankar serves as Chair of the Board's Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance

Committee.  According to the Company's public filings, Sankar received $20,645,995 in 2021 in compensation from the Company.

30.     Defendant Arie Belldegrun ("Belldegrun") has served as a director of the Company since the Merger.  Prior to the Merger, Belldegrun served as an advisor to SRNG during negotiations and due diligence into Ginkgo.  Belldegrun serves as a member of the Board's Compensation Committee.

31.     Defendant Reshma Kewalramani ("Kewalramani") has served as a director of the Company since the Merger.

32.     Defendant Harry E. Sloan ("Sloan") served as CEO and Chairman of the Board of SRNG from October 2020 until the Merger.  Since the Merger, Sloan has served as a director of the Company.  Sloan serves as a member of the Board's Audit Committee.

33.     The defendants identified in paragraphs 24-32 above are collectively referred to herein as the "Ginkgo Defendants."

***The SRNG Defendants***

34.     Defendant Scott M. Delman ("Delman") served as a director of SRNG from its IPO in February 2021 until the Merger.

35.     Defendant Joshua Kazam ("Kazam") served as a director of SRNG from its IPO in February 2021 until the Merger.

36.     Defendant Isaac Lee ("Lee") served as a director of SRNG from its IPO in February 2021 until the Merger.

37.     Defendant Timothy Leiweke ("Leiweke") served as a director of SRNG from its IPO in February 2021 until the Merger.

38.     Defendant Dennis A. Miller ("Miller") served as a director of SRNG from its IPO in February 2021 until the Merger.

39.     Defendant Laurence E. Paul ("Paul") served as a director of SRNG from its IPO in February 2021 until the Merger.

40.     The Defendants identified in paragraphs 34 through 39 above are collectively referred to herein as the "SRNG Defendants" and, together with the Ginkgo Defendants,

1    collectively referred to as the "Individual Defendants."

2    **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

3        41.    By reason of their positions as officers and/or directors of Ginkgo, and because of

4    their ability to control the business and corporate affairs of Ginkgo, the Ginkgo Defendants owed

5    Ginkgo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and

6    were and are required to use their utmost ability to control and manage Ginkgo in a fair, just,

7    honest, and equitable manner.  The Ginkgo Defendants were and are required to act in furtherance

8    of the best interests of Ginkgo and its shareholders so as to benefit all shareholders equally.

9        42.    Each director and officer of the Company owes to Ginkgo and its shareholders the

10   fiduciary duty to exercise good faith and diligence in the administration of the Company and in

11   the use and preservation of its property and assets and the highest obligation of fair dealing.

12       43.    The Ginkgo Defendants, because of their positions of control and authority as

13   directors and/or officers of Ginkgo, were able to and did, directly and/or indirectly, exercise

14   control over the wrongful acts complained of herein.

15       44.    To discharge their duties, the officers and directors of Ginkgo were required to

16   exercise reasonable and prudent supervision over the management, policies, controls, and

17   operations of the Company.

18       45.    Each Ginkgo Defendant, by virtue of his or her position as a director and/or officer

19   owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith,

20   and the exercise of due care and diligence in the management and administration of the affairs of

21   the Company, as well as in the use and preservation of its property and assets.  The conduct of

22   the Ginkgo Defendants complained of herein involves a knowing and culpable violation of their

23   obligations as directors and/or officers of Ginkgo, the absence of good faith on their part, or a

24   reckless disregard for their duties to the Company and its shareholders that the Ginkgo Defendants

25   were aware or should have been aware posed a risk of serious injury to the Company.

26       46.    As senior executive officers and directors of a publicly-traded company whose

27   common stock was registered with the SEC pursuant to the Exchange Act and traded on the

28   NYSE, the Ginkgo Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

47. To discharge their duties, the officers and directors of Ginkgo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ginkgo were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Ginkgo's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Ginkgo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Ginkgo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ginkgo's operations would comply with all applicable laws and Ginkgo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

48.     Each of the Ginkgo Defendants further owed to Ginkgo and the shareholders the duty of loyalty requiring that each favor Ginkgo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

49.     At all times relevant hereto, the Ginkgo Defendants were the agents of each other and of Ginkgo and were at all times acting within the course and scope of such agency.

50.     Because of their advisory, executive, managerial, and directorial positions with Ginkgo, each of the Ginkgo Defendants had access to adverse, non-public information about the Company.

51.     The Ginkgo Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ginkgo.

**GINKGO'S CODE OF BUSINESS CONDUCT AND ETHICS**

52.     Ginkgo's Code of Conduct explicitly applies to "all of the directors, officers,

employees, and contractors of Ginkgo."

53.     The Code of Conduct begins with a commitment to "honesty and the highest standards of business ethics."

54.     In a section titled "Protection and Use of Company Assets," the Code of Conduct states, in relevant part:

> Loss, theft or misuse of our assets has a direct impact on our business and financial status. You are expected to protect Ginkgo's assets that are entrusted to your or your designated agent and to protect Ginkgo's assets in general. You are also expected to take steps to ensure that our assets are used only for legitimate business purposes.

55.     In a section titled, "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding Ginkgo's business, financial condition and results of operations. We expect you to provide accurate, complete and timely reporting to Ginkgo as applicable to your responsibilities at Ginkgo. Please refer to Ginkgo's Policies and Procedures for Complaints Regarding Accounting, Internal Accounting Controls, Fraud, or Auditing Matters for more details.

> The people working in our finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate in all material respects, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all applicable standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

56.     In a section titled "Compliance with Laws and Regulations," the Code of Conduct states, in relevant part: "You have an obligation to comply with all laws, rules, and regulations applicable to our operations. You are expected to understand and comply with all laws, rules and regulations that apply to your job position."

57.     In a section titled "Public Communications and Regulation FD," the Code of Conduct states, in relevant part:

a)      Public Communications Generally

We value transparency and want to build and maintain trust with our stakeholders and the broader community. What is written or said about us in the news media and

investment community directly impacts our reputation, positively or negatively. Our policy is to provide accurate information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. We have adopted Guidelines for Corporate Disclosure to build trust with our stakeholders and in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

b)     Compliance with Regulation FD

In connection with our public communications, we are required to comply with a regulation under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD requires that, when we disclose material nonpublic information about Ginkgo to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

We have designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. If you are not a designated spokesperson of Ginkgo, you should not communicate information about Ginkgo to analysts, institutional investors or representatives of the media, except at the request of our designated spokespersons.

## **GINKGO'S AUDIT COMMITTEE CHARTER**

58.     Pursuant to Ginkgo's Audit Committee Charter, the purpose of the Audit Committee is to:

Assist the Board of Directors (the "Board") in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function (including any third party providing internal audit services) and independent auditor

59.     The Audit Committee Charter further provides that the Audit Committee will "review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies" and "review and oversee related person transactions in accordance with the Company's related person transaction policy and procedures."

60.     Additionally, with respect to "Compliance Oversight," the Audit Committee Charter states that:

> The Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies, and any published reports that raise material issues regarding the Company's financial statements. The Committee must discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies. The Committee will advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations, and with the Company's code of business conduct and ethics.

61.     At all relevant times alleged herein, Defendant Henry served as Chair of the Audit Committee, and Defendants Sankar and Sloan served as members of the Audit Committee.

## SUBSTANTIVE ALLEGATIONS

***Background***

62.     SRNG, originally known as Spinning Eagle Acquisition Corp. but later renamed Soaring Eagle Acquisition Corp., was operated as a special purpose acquisition company ("SPAC"), which is a development-stage corporation listed on a stock exchange with no particular business plan or purpose other than to acquire an unidentified private company, thus making it public without going through the traditional public offering process.

63.     SPAC founders cannot identify a target company until the SPAC initial public offering ("IPO") is completed.  Proceeds raised in the SPAC initial public offering are deposited into a trust account while the SPAC's management team identifies an appropriate target to complete the merger within a specified time period.  Once the management team identifies a target, shareholders of the SPAC vote to approve or reject the merger.

64.     SRNG completed its IPO on February 26, 2021, and it had a two-year period in which to complete the business combination.

65.     Only if a merger is effectuated within the designated time frame can shareholders and management of the SPAC profit through ownership of common stock; if a merger is not completed within the time period stipulated when the SPAC is organized, then the SPAC is dissolved, and the proceeds held in trust are returned to investors.  The founders and/or management do not receive salaries, fees, or any other cash compensation if they fail to complete

the merger. Accordingly, the founders and management team of a SPAC are highly incentivized to complete a merger within the designated time frame.

66.     On May 11, 2021, SRNG announced that it had entered into a merger agreement (the "Merger Agreement") with Legacy Ginkgo, a biotechnology company incorporated in Delaware and headquartered in Boston, Massachusetts, which uses genetic engineering to produce microorganisms that have applications in a variety of industries.

67.     Ginkgo primarily generates revenue through its product sales, partnerships, and licensing agreements with the use of its two core assets: Foundry and Codebase. Ginkgo uses the Foundry, a microbe engineering lab, to provide R&D services to other companies. The Codebase is the collection of biological parts and data gained from the Company's efforts in the Foundry.

68.     On May 14, 2021, SRNG filed a registration statement in connection with the proposed business combination on Form S-4 with the SEC (the "Registration Statement").

69.     Pursuant to the Merger Agreement, Legacy Ginkgo would merge with a subsidiary of SRNG called SEAC Merger Sub Inc. ("Merger Sub"), and SRNG would rename itself Ginkgo Bioworks Holdings, Inc.

70.     On August 13, 2021, SRNG filed a Proxy Statement with the SEC, calling on its shareholders to, among other things, approve several proposals necessary to consummate the proposed business combination.

71.     On September 16, 2021, the parties to the Merger Agreement effectuated the business combination (the "Merger"), and the Company's common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol, "DNA."

72.     The terms of the Merger valued Ginkgo at $15.8 billion which was highly unfavorable to SRNG's shareholders. Ginkgo's valuation was materially inflated as a result of false and misleading statements issued by SRNG Defendants prior to the Merger which misleadingly touted Ginkgo's Foundry revenue and business prospects while concealing the Company's dependence on related-party revenues (the "Misclassification Misconduct").

***The Misclassification Misconduct***

73.     As detailed in the Scorpion Report, Ginkgo is highly integrated with various

related parties—many of which are funded and/or controlled by Ginkgo. Several of these purportedly independent entities, including Allonnia, Kalo Ingredients, Motif FoodWorks, and Joyn Bio, shared a telephone number with and/or were housed in the same facility as Ginkgo, and many of the Company's related parties utilized websites lacking in content and appearing to have been designed by Ginkgo. For example, the Scorpion Report observed that Allonnia's website indicated that it was "Powered by GINKGO BIOWORKS."

74. The Scorpion Report also noted the revolving nature of employment at the Company and its related parties, further highlighting the close intertwining between Ginkgo and these other companies. For example, Allonnia lists Defendant Kelly and Ginkgo's Head of Ventures, Jason Kakoyiannis ("Kakoyiannis"), as its managers. Kelly and Kakoyiannis also serve as directors of Motif FoodWorks, another Ginkgo related party. Allonia also hired a temporary CFO that serves in the same role for three different entities, including Motif FoodWorks. The Scorpion Report further noted that at least one employee had moved from Ginkgo to a related party while still receiving compensation from Ginkgo.

75. The Scorpion Report detailed the Company's "circular" revenue practices with respect to these related parties. Specifically, Ginkgo exploited its related-party relationships to lock these entities into substantial prepayments and above-market fees for its services.

76. For example, Ginkgo purchased stock and warrants from a related party called Synlogic. While Ginkgo has acknowledged that the fair value of this investment was $50 million, Ginkgo and Synlogic entered into an agreement whereby Ginkgo would pay Synlogic $80 million and Synlogic would return $30 million to Ginkgo as a "nonrefundable prepayment for Foundry services." An individual interviewed by Scorpion characterized that transaction as stating, "they provided Synlogic $30 million, Synlogic turned around and paid it to them, so they were registering their own money as revenue."

77. Joyn Bio, a joint venture between Ginkgo and Bayer, which lists Defendants Kelly and Shetty as directors and is housed in a Ginkgo facility, funneled $20 million in cash to Ginkgo as a "nonrefundable prepayment" for technical services as soon as the joint venture was formed. In 2019, Joyn Bio paid Ginkgo an additional $15 million "prepayment."

78.     As detailed in the Scorpion Report, Ginkgo misclassified and underreported these "circular" related-party revenues.  For example, in Synlogic's annual report filed on March 25, 2021 on Form 10-K with the SEC, Synlogic reported that it used $13.6 million of pre-paid research and development expenses in the 2020 Fiscal year; however, Ginkgo only reported $73,000 in related-party Foundry revenue from Synlogic for the 2020 Fiscal Year.  The Scorpion Report concluded that Ginkgo misclassified Synlogic's spending "in order to conceal [Ginkgo's] near-total dependence on parties it finances," observing that, had Ginkgo accurately reported Synlogic's Foundry spending, Ginkgo's "related party revenues as a percent of total would have jumped from 72% to 95%."

79.     Individuals interviewed by Scorpion, who were all former employees of either Ginkgo or its related parties, recalled a pattern of retaliation against employees who refused to cooperate with the Company's Misclassification Misconduct.  One former employee recalled "about three people" that were reprimanded or terminated for resisting the scheme.  Further, several former employees of Ginkgo interviewed in the Scorpion Report discussed fear within the Company that its business model would not withstand regulatory scrutiny, providing a motive for SRFNG Defendants to issue false and misleading statements concealing Ginkgo's Misclassification Misconduct.

***Defendants' False and Misleading Statements***

80.     Throughout Relevant Period, the Individual Defendants issued false and misleading statements which touted Ginkgo's Foundry revenue and partnership agreements while concealing the Company's reliance on related parties by misclassifying and underreporting related-party revenue (the "Misclassification Conduct").

<u>May 11, 2021 Press Release</u>

81.     On May 11, 2021, the Company issued a press release titled "Ginkgo Bioworks to Become a Public Company and Expand its Leading Platform for Cell Programming," announcing Ginkgo's intention to go public via SPAC (the "May 11, 2021 Press Release").  The press release was attached to the Company's Form 8-K filed the same day.  The May 11, 2021 Press Release touted Ginkgo's equity valuation, stating, "[t]he transaction implies a pre-money

equity valuation for Ginkgo of $15.0 billion, and is expected to provide up to $2.5 billion of gross cash proceeds."

<u>The Registration Statement</u>

82.    On May 14, 2021, the Company filed a registration statement in connection with the proposed merger on Form S-4 with the SEC.  The Registration Statement was signed by the SRNG Defendants.  The Registration Statement touted Ginkgo's Foundry revenues:

> Our business model mirrors the structure of our platform and we are compensated in two primary ways. First, we charge usage fees for Foundry services, in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services. The total addressable market (TAM) for our Foundry revenue includes the market for biotech labor and tools, which industry sources estimate will be approximately $40 billion in 2021 and which is expected to grow at a CAGR of approximately 20% from 2021 to 2023. ***Foundry revenue was $59.2 million for the year ended December 31, 2020. Additionally, we negotiate a value share with our customers (typically in the form of royalties, milestones, and/or equity interests) in order to align our economics with the success of the programs enabled by our platform. As we add new programs, our portfolio of programs with this "downstream" value potential grows.*** Through these value shares, we are tapping into what industry sources expect to be a $2 to $4 trillion market for bioengineered products.

(Unless otherwise noted, all emphasis used in this Complaint is added).

83.    In a section titled "Generating Economic Value Through Revenue and Downstream Value Share," the Registration Statement provided, "Our cell programming platform is a key enabling technology and source of intellectual property for our customers' products.  We earn both Foundry revenue for our research and development ("R&D") services as well as a share of the value of products created using our platform."

84.    With respect to Ginkgo's Foundry revenues, the Registration Statement further stated:

> We generate Foundry revenue through the execution of license and collaboration agreements whereby customers obtain license rights to our proprietary technology and intellectual property for use in the development and commercialization of engineered organisms and derived products. Under these agreements, we typically provide R&D services for cell programming with the goal of producing an engineered cell that meets a mutually agreed specification. Our customers obtain license rights to the output of our services, which are primarily the optimized strains or cell lines, in order to manufacture and commercialize products derived from that

licensed strain or cell line. Generally, the terms of these agreements provide that we receive some or all of the following: (i) upfront payments upon consummation of the agreement that are recognized over our period of performance, (ii) reimbursement for costs incurred for R&D services, (iii) milestone payments upon the achievement of specified technical and/or commercial criteria, (iv) royalties on sales of products from or comprising engineered organisms arising from the license and collaboration agreement and (v) royalties related to cost of goods sold reductions realized by our customers. For the years ended December 31, 2020 and 2019, royalties did not comprise a material amount of our revenue.

***Foundry revenue includes transactions with Platform Ventures (Motif, Joyn and Allonnia) as well as other Structured Partnerships (Genomatica and Synlogic) where, as part of these transactions, we received an equity interest in such entities. Specifically related to the Platform Ventures, in these transactions, we received upfront non- cash consideration in the form of common equity interests in these entities, while the Platform Ventures each received cash equity investments from industry-leading strategic partners and financial investors. We view the upfront non-cash consideration as prepayments for licenses which will be granted in the future as we complete mutually agreed upon technical development plans. In these instances, we also receive cash payments for our costs incurred for the R&D services performed by us, plus a margin.*** We are not compensated through additional milestone or royalty payments under these arrangements. Our transactions with Genomatica and Synlogic included the purchase of equity securities and the provision of R&D services. As we perform R&D services under the mutually agreed upon development plans, we recognize a reduction in the prefunded obligation based on a cost incurred, plus margin. Because of our equity holdings in these entities, each is considered as a related party. These arrangements are further described in Notes 8, 17 and 21 of our audited consolidated financial statements included elsewhere in this proxy statement/prospectus.

Downstream value share in the form of equity interest appreciation is not recognized as revenue but is expected to contribute to future cash flows upon liquidation, the amount and timing of which is inherently unpredictable. Equity investees are accounted for as equity method investments or cost method investments.

85.     The Registration Statement itemized Ginkgo's related party revenues as follows:

**21.   Related Parties**

Related party transactions included in the Consolidated Balance Sheets, excluding the Company's investments and equity method investments, are summarized below (in thousands):

| | Joyn | Motif | Genomatica | Allonnia | Synlogic | Total |
|---|---|---|---|---|---|---|
| **Balances as of December 31, 2020** | | | | | | |
| Accounts receivable, net | $ — | $ 2,403 | $ 1,500 | $ 1,309 | $ — | $ 5,212 |
| Prepaid expenses and other current assets | $ 24 | $ 232 | $ — | $ 13 | $ — | $ 269 |
| Deferred revenue, current and non-current | $ 9,862 | $53,952 | $ 30,128 | $26,064 | $ 72 | $120,078 |
| **Balances as of December 31, 2019** | | | | | | |
| Accounts receivable, net | $ 163 | $ 4,054 | $ — | $ — | $ — | $ 4,217 |
| Deferred revenue, current and non-current | $17,135 | $62,513 | $ 38,059 | $24,480 | $ 144 | $142,331 |

Related party transactions included in the Consolidated Statements Operations and Comprehensive Loss, excluding the losses on the Company's investments and equity method investments, are summarized below (in thousands):

| | Joyn | Motif | Genomatica | Allonnia | Synlogic | Glycosyn | Total |
|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31, 2020** | | | | | | | |
| Foundry revenue | $ 7,273 | $ 20,798 | $ 9,431 | $ 4,960 | $ 73 | $ — | $ 42,535 |
| Other income, net | $ 407 | $ 314 | $ — | $ — | $ — | $ — | $ 721 |
| **For the Year Ended December 31, 2019** | | | | | | | |
| Foundry revenue | $ 9,349 | $ 18,986 | $ 6,248 | $ — | $ 17 | $ 668 | $ 35,268 |
| Interest income | $ — | $ — | $ — | $ — | $ — | $ 163 | $ 163 |
| Other income, net | $ 222 | $ 42 | $ — | $ — | $ — | $ 1,530 | $ 1,794 |

86.     With respect to Motif FoodWorks, the Registration Statement touted the related party as one of the Company's top two customers, stating that it "represented more than 10% of our total revenue" but that Ginkgo "is not the primary beneficiary of [Motif FoodWorks]" because Ginkgo does not have "the power to control . . . the most significant activities of Motif," including its "development activities." This statement was materially false and misleading and omitted to state facts necessary to make the statement not misleading because it failed to disclose that Ginkgo did in fact exercise control over Motif FoodWorks including over its development activities because its development activities were conducted by Ginkgo in Ginkgo facilities and under the direction and management of Ginkgo executives Kelly and Kakoyiannis.

87.     Amended versions of the Registration Statement, filed by SRNG on June 8, 2021, July 16, 2021, August 4, 2021, and August 9, 2021 contained substantially the same false and misleading statements that were contained in the original, May 14, 2021 Registration Statement.

<u>August 12, 2021 Press Release</u>

88.     On August 12, 2021, Ginkgo issued a press release announcing a partnership with Antheia, Inc. ("Antheia"). That press release stated that "Antheia plans to leverage Ginkgo's high throughput enzyme design and screening capabilities to broaden its pipeline of critical active pharmaceutical ingredients (APIs) and key starting materials (KSMs)." The press release failed

to disclose that, just weeks earlier, Antheia's $73 million financing was led by Viking Opportunities Illiquid Investments Sub-Master LP ("Viking"), a major investor in Ginkgo who held 25.9% of the Company's Class A common stock as of November 8, 2021.

The Proxy Statement

89.     On August 13, 2021, the Company filed the Proxy Statement with the SEC, signed by the SRNG Defendants.

90.     In order to solicit the requisite shareholder approval for the proposed merger, the Proxy Statement misleadingly touted Ginkgo's inflated Foundry revenues and business prospects:

> Our business model mirrors the structure of our platform and we are compensated in two primary ways. First, we charge usage fees for Foundry services, in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services. The total addressable market (TAM) for our Foundry revenue includes the market for biotech labor and tools, which industry sources estimate will be approximately $40 billion in 2021 and which is expected to grow at a CAGR of approximately 20% from 2021 to 2023. ***Foundry revenue was $59.2 million for the year ended December 31, 2020 and $22.5 million for the three months ended March 31, 2021. Additionally, we negotiate a value share with our customers (typically in the form of royalties, milestones, and/or equity interests) in order to align our economics with the success of the programs enabled by our platform. As we expand our portfolio of programs with this "downstream" value potential grows.*** Through these value shares, we are tapping into what industry sources expect to be a $2 to $4 trillion market for bioengineered products.

91.     In a section titled "Generative Economic Value Through Revenue and Downstream Value Share," the Proxy Statement provided, "Our cell programming platform is a key enabling technology and source of intellectual property for our customers' products.  We earn both Foundry revenue for our research and development ("R&D") services as well as a share of the value of products created using our platform."

With respect to Ginkgo's Foundry revenues derived from related party transactions, the Proxy Statement stated:

> We generate Foundry revenue through the execution of license and collaboration agreements whereby customers obtain license rights to our proprietary technology and intellectual property for use in the development and commercialization of engineered organisms and derived products. Under these agreements, we typically provide R&D services for cell programming with the goal of producing an engineered cell that meets a mutually agreed specification. Our customers obtain

license rights to the output of our services, which are primarily the optimized strains or cell lines, in order to manufacture and commercialize products derived from that licensed strain or cell line. Generally, the terms of these agreements provide that we receive some combination of (i) upfront payments upon consummation of the agreement that are recognized over our period of performance, (ii) reimbursement for costs incurred for R&D services, (iii) milestone payments upon the achievement of specified technical and/or commercial criteria, (iv) royalties on sales of products from or comprising engineered organisms arising from the license and collaboration agreement and (v) royalties related to cost of goods sold reductions realized by our customers. For the three months ended March 31, 2021 and 2020 and the years ended December 31, 2020 and 2019, royalties did not comprise a material amount of our revenue.

*Foundry revenue includes transactions with Platform Ventures (Motif, Joyn, Allonnia and Kalo) as well as other Structured Partnerships (Genomatica and Synlogic) where, as part of these transactions, we received an equity interest in such entities. Specifically related to the Platform Ventures, in these transactions, we received upfront non-cash consideration in the form of common equity interests in these entities, while the Platform Ventures each received cash equity investments from industry-leading strategic partners and financial investors. We view the upfront non-cash consideration as prepayments for licenses which will be granted in the future as we complete mutually agreed upon technical development plans. In these instances, we also receive cash payments for our costs incurred for the R&D services performed by us, plus a margin.* We are not compensated through additional milestone or royalty payments under these arrangements. Our transactions with Genomatica and Synlogic included the purchase of equity securities and the provision of R&D services. As we perform R&D services under the mutually agreed upon development plans, we recognize a reduction in the prefunded obligation based on a cost incurred, plus *margin. Because of our equity holdings in these entities, each is considered as a related party. These* arrangements are further described in Notes 8, 17 and 21 of our audited consolidated financial statements and in Notes 7, 8, 15 and 17 of our unaudited condensed consolidated financial statements included elsewhere in this proxy statement/prospectus.

Downstream value share in the form of equity interest appreciation is not recognized as revenue but is expected to contribute to future cash flows upon liquidation, the amount and timing of which is inherently unpredictable. Equity investees are accounted for as equity method investments or cost method investments.

92.     The Proxy Statement itemized Ginkgo's related party revenues as follows:

**21.  Related Parties**

Related party transactions included in the Consolidated Balance Sheets, excluding the Company's investments and equity method investments, are summarized below (in thousands):

| | Joyn | Motif | Genomatica | Allonnia | Synlogic | Total |
|---|---|---|---|---|---|---|
| **Balances as of December 31, 2020** | | | | | | |
| Accounts receivable, net | $  — | $  2,403 | $  1,500 | $ 1,309 | $  — | $  5,212 |
| Prepaid expenses and other current assets | $    24 | $    232 | $     — | $     13 | $  — | $     269 |
| Deferred revenue, current and non-current | $ 9,862 | $53,952 | $ 30,128 | $26,064 | $  72 | $120,078 |
| **Balances as of December 31, 2019** | | | | | | |
| Accounts receivable, net | $   163 | $  4,054 | $     — | $     — | $  — | $  4,217 |
| Deferred revenue, current and non-current | $17,135 | $62,513 | $ 38,059 | $24,480 | $ 144 | $142,331 |

Related party transactions included in the Consolidated Statements Operations and Comprehensive Loss, excluding the losses on the Company's investments and equity method investments, are summarized below (in thousands):

| | Joyn | Motif | Genomatica | Allonnia | Synlogic | Glycosyn | Total |
|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31, 2020** | | | | | | | |
| Foundry revenue | $ 7,273 | $ 20,798 | $  9,431 | $ 4,960 | $  73 | $  — | $ 42,535 |
| Other income, net | $   407 | $    314 | $     — | $     — | $  — | $  — | $    721 |
| **For the Year Ended December 31, 2019** | | | | | | | |
| Foundry revenue | $ 9,349 | $ 18,986 | $  6,248 | $     — | $  17 | $ 668 | $ 35,268 |
| Interest income | $     — | $     — | $     — | $     — | $  — | $ 163 | $    163 |
| Other income, net | $   222 | $     42 | $     — | $     — | $  — | $ 1,530 | $  1,794 |

93.    With respect to the Company Board's risk oversight functions, and those of each Board committee, the Proxy Statement stated:

> The New Ginkgo Board will have extensive involvement in the oversight of risk management related to New Ginkgo and its business and will accomplish this oversight through the regular reporting to the board of directors by the audit committee. The audit committee will represent the New Ginkgo Board by periodically reviewing New Ginkgo's accounting, reporting and financial practices, including the integrity of its financial statements, the surveillance of administrative and financial controls and its compliance with legal and regulatory requirements. Through its regular meetings with management, including the finance, legal, internal audit and information technology functions, the audit committee will review and discuss all significant areas of New Ginkgo's business and summarize for the New Ginkgo Board all areas of risk and the appropriate mitigating factors. In addition, the New Ginkgo Board will receive periodic detailed operating performance reviews from management.

94.    With respect to the specific functions of the Audit Committee following the merger, the Proxy Statement stated:

> The purpose of the audit committee will be to prepare the audit committee report required by the SEC to be included in New Ginkgo's proxy statement and to assist the board of directors in overseeing and monitoring (1) the quality and integrity of the financial statements, (2) compliance with legal and regulatory requirements, (3) New Ginkgo's independent registered public accounting firm's qualifications and independence, (4) the performance of New Ginkgo's internal audit function and (5) the performance of New Ginkgo's independent registered public accounting firm.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

-21-

95.     The Proxy Statement was materially false and misleading and omitted to state material facts necessary to make it not misleading because it failed to disclose that: (i) the SRNG Defendants had failed to exercise their risk oversight responsibilities at SRNG; (ii) the post-Merger Company's Board and Audit Committee would also fail to exercise these functions; and (iii) Defendant Sloan, who served on the SRNG Board prior to the Merger and continued as a director of Ginkgo after the Merger, was improperly motivated by being unjustly enriched in securing the requisite shareholder approval.

September 7, 2021 Press Release

96.     On September 7, 2021, Ginkgo issued a press release announcing its partnership agreement with Tantu, a biotechnology company that engineers microbe-based products for the treatment of gastrointestinal diseases.  That press release stated that "Tantu will leverage Ginkgo's foundries to accelerate strain construction as a key step toward human clinical trials."  It further stated, in relevant part:

> Tantu is working to create an orally administered, living biotherapeutic that will produce and apply anti-inflammatory therapeutic proteins directly into diseased sites in the gut, resulting in improved gut barrier function and faster mucosal healing in patients where systemic anti-inflammatory therapies are not enough. Ginkgo plans to apply its automated foundry to accelerate the traditionally slow steps of candidate strain construction and genomic integration and validation with the aim of accelerating Tantu's first program and potentially helping them reach clinical proof of concept in patients faster.

97.     The Registration Statement, Proxy Statement and the Press Releases issued on May 11, 2021, August 12, 2021, and September 7, 2021 contained statements that were materially false and misleading and omitted to state material facts necessary to make the statements not misleading because they failed to disclose: (i) Ginkgo's misclassification conduct; (ii) Ginkgo's near full reliance on related parties that it created, funded, or controlled; (iii) the failure of Ginkgo's Board to maintain adequate internal controls; and (iv) as a result of the foregoing, the valuation of Ginkgo was materially inflated.

***The Truth Emerges***

98.     On October 6, 2021, Scorpion issued a report which characterized Ginkgo as a "colossal scam" and a "shell game" that was highly reliant on related party transactions. Scorpion

interviewed 21 former employees and executives of the Company and its purported customers as a part of its investigation.

99.     With respect to Ginkgo's dependence on related parties that it created, funded, or controlled, the Scorpion Report stated:

> The Majority of its foundry revenue, an absurd 72% in 2020, and essentially 100% of its deferred revenue are derived from related-party "customers" it created, funded, controls, or influences via its ownership position and board seats. Investments into these entities by Ginkgo and its largest investors are recycled back to Ginkgo and recorded as deferred or current revenue. The scheme reflects its woeful, decade-long failure to derive real revenue from third-party customers, forcing it to cover it up with a ploy that we believe to be enabled by its largest holders.

100.     The Scorpion Report further revealed Ginkgo's efforts to conceal its dependence on related parties:

> We believe that Ginkgo is concealing the true extent of its dependence on related party revenue and that it is far greater than it reports. ***We have uncovered a smoking gun that indicates that essentially ALL of its foundry revenue is derived from related parties, suggesting that Ginkgo has engaged in a brazen effort to misclassify and misreport related party revenue and deceive investors with phony accounting***. Our interviews with ex-employees indicated fear inside Ginkgo that its related-party model would fail regulatory scrutiny and derail an IPO, which we believe has prompted a cover-up of its magnitude.

101.     With respect to Ginkgo's reported Foundry revenue, the Scorpion Report stated:

> Ginkgo is opaque about the percent of its revenue and deferred revenue which is cash versus non-cash. Based on interviews with its related-party "customers," we believe that at least half of Ginkgo's reported foundry revenue is phantom –that is, non-cash and pure accounting hocus-pocus. We spoke with one of its largest such customers, from whom Ginkgo reported $38MM and $30MM of deferred revenue in 2019 and 2020. A senior employee there stated unequivocally that they have never paid Ginkgo cash for foundry services and are merely using "free" R&D credits following investments by Ginkgo and Viking. Giving away the essence of the scam, the customer stated they would not use Ginkgo if they had to pay cash, dismissing them as a failed contract research organization (CRO) that they neither trust to deliver nor could justify except under a round-tripping deal.

The Scorpion Report further denounced Ginkgo's business model, its reliance on related parties, and its efforts to conceal that reliance which were in part motivated by fear within the Company that its related party model would not withstand regulatory scrutiny:

> We noted earlier that the majority of Ginkgo's foundry revenue comes from related

party entities: 65% in 2019, 72% in 2020, and 56% in 2021. We believe that the actual figure is essentially 100%, and think that Ginkgo is misclassifying and underreporting related party revenue. While the reported 60-70% percentage is bad enough and indicative of a broken, hocus-pocus business model, it's still better than 100%. Ginkgo can claim that at least 30- 40% of foundry revenue comes from third parties, and that its reliance decreased in Q1 2021 to "only" 56%. Ex-employees indicated fear inside Ginkgo that its related party model doesn't stand up to regulatory scrutiny and could prevent it from going public – hence, we believe, an effort, to fake the reported figure.

102.    The Scorpion Report contained a chart depicting Ginkgo's reported related party foundry revenues in 2019 and 2020:

| (in thousands) | | Year Ended December 31, | |
| --- | --- | --- | --- |
| | | 2020 | 2019 |
| Foundry revenue (includes related party revenue of $42,535 and $35,268, respectively) | | $  59,221 | $  54,184 |

| in millions USD | 2019 | 2020 | Q1 2021 | |
| --- | --- | --- | --- | --- |
| **Foundry revenue by related party** | | | | |
| Joyn | 9,349 | 7,273 | 1,598 | *Reported related party foundry revenues totaled 65% in 2019 and 72% in 2020* |
| Motif | 18,986 | 20,798 | 5,492 | |
| Genomatica | 6,248 | 9,431 | 3,298 | |
| Allonnia | | 4,960 | 2,266 | |
| Synlogic | 17 | 73 | 6 | |
| Glycosyn | 668 | - | - | |
| Kalo | - | - | - | |
| **Total** | 35,268 | 42,535 | 12,660 | |
| **Total foundry revenue** | 54,184 | 59,221 | 22,504 | |
| | | | | |
| **Related parties as % of total foundry revenue** | **65%** | **72%** | **56%** | |

Source: Soaring Eagle Acquisition Corp prospectus 8/13/2021, https://www.sec.gov/Archives/edgar/data/0001830214/000119312521246097/d177007d424b3.htm; Scorpion Capital analysis and estimates

103.    The Scorpion Report noted discrepancies between Ginkgo's public disclosures and those of one of its related parties, Synlogic which demonstrated the Company's underreporting of related-party revenue:

As we examined Ginkgo's related party disclosures, we noted a major anomaly: Ginkgo invested $80MM in Synlogic in 2018, but disclosed almost no revenue from it in 2019 and 2020 in the footnotes. Similarly, it reported a minimal deferred revenue balance with Synlogic, in Note 21 in the SPAC prospectus. In every other case, Ginkgo aggressively booked revenue and deferred revenue from related parties in which it invested. We were initially stumped.

*                        *                        *

As Synlogic is a publicly-traded microcap (ticker: SYBX) with $150MM market cap, we examined its SEC filings. We were amused, but not surprised, to discover that Synlogic's 2020 10K, under Note 16 for Related-Party Transactions, disclosed that Synlogic "used $13.6 million of the pre-paid research and development expenses" in 2020. This is in stark contrast to Ginkgo's related party disclosure, which reports only $73K of foundry revenue from Synlogic.

\* \* \*

***Synlogic's disclosures suggest that Ginkgo has misclassified Synlogic's R&D
spend in order to conceal its near-total dependence on parties it finances.*** Had
Ginkgo included Synlogic's foundry spend of $13.6MM, related party revenues as
a percent of total would have jumped from 72% to 95%-that is, Ginkgo would have
had to admit that its foundry is a flop and that it can't get customers unless it gives
them cash and round-trips the proceeds.

**Related party revenue as reported**

| in millions USD | 2020 |
|---|---|
| **Foundry revenue by related party** | |
| Joyn | 7,273 |
| Motif | 20,798 |
| Genomatica | 9,431 |
| Allonnia | 4,960 |
| Synlogic | 73 |
| Glycosyn | - |
| Kalo | - |
| **Total** | 42,535 |
| **Total foundry revenue** | 59,221 |
| Related parties as % of total foundry revenue | 72% |

**Adjusted to include Synlogic revenue**

| in millions USD | 2020 |
|---|---|
| **Foundry revenue by related party** | |
| Joyn | 7,273 |
| Motif | 20,798 |
| Genomatica | 9,431 |
| Allonnia | 4,960 |
| Synlogic | 13,600 |
| Glycosyn | - |
| Kalo | - |
| **Total** | 56,062 |
| **Total foundry revenue** | 59,221 |
| Related parties as % of total foundry revenue | 95% |

104.     The Scorpion Report further alleged that many of Ginkgo's recently announced
partnerships were "undisclosed related parties . . . providing proceeds that will be round-tripped
back to Ginkgo as 'revenue' in coming quarters:"

The number of new "partners" announced in the last few weeks just prior to the
first day of trading on Sep 17th is stunning. The partnerships are for everything
under the sun: GI drugs, probiotics, herbal medicines and nutraceuticals,
"biomaterials," dyes, a material inspired by spiders with "silk-like softness."
Notably, not one of the releases below discloses a deal size – and all are silent on
the critical question of whether they are undisclosed related parties – that is,
whether Ginkgo or its investors like Viking are investors in the entities or are
providing proceeds that will be round-tripped back to Ginkgo as "revenue" in
coming quarters. We shortly reveal a smoking gun that exposes the rig as exactly
that.

105.     The Scorpion Report noted that the press release issued by the Company on August
12, 2021 announcing its partnership with Antheia was highly misleading and omitted to state facts
necessary to make it not misleading: ""[t]he press release for Ginkgo's Antheia partnership on
Aug 12, 2021 ***makes no mention of the fact that Viking led Antheia's $73MM financing a few
weeks prior to the Ginkgo announcement.***"

106.     With respect to Ginkgo's partnership with Tantu, the Scorpion Report stated:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

-25-

The Tantu partnership announced less than a week after Cambium is particularly grandiose: "Tantu will leverage Ginkgo's foundries to accelerate strain construction as a key step toward human clinical trials." Clinical trials presume an advanced program, typically after tens or hundreds of millions spent on R&D. Imagine our surprise after discovering that Tantu appears to have no full-time employees. It doesn't even appear to be a company, nor even a project –merely an idea. Co-founder Neel Joshi is a full time associate professor at Northeastern; a second co-founder is currently CEO of another startup; a third was a post-doc in Joshi's lab until August, when she took another job.

*   *   *

Similar to Cambium, we suspected that Tantu is also an undisclosed related-party in which Ginkgo has or will make an investment which will be recycled back as "revenue." We spoke with an individual closely involved with Tantu, who indicated that Tantu has raised $50k to date via a university grant –"just enough to get a website and stuff like that and incorporate." The individual stated that Tantu "doesn't have money to pay" Ginkgo for R&D services, so "the deal ended up being like a deferred loan, essentially, for the work they are going to do." The individual did not disclose the amount of funding Ginkgo provided, but indicated it was similar in magnitude to a Series A round.

107.    The Scorpion Report further described the Company's "fraudulent" reporting practices:

Aside from its "customers" being related parties and effectively fake, ***we believe that Ginkgo takes the scam into even more aggressive territory by booking revenue from them that is simply fictitious, overstated, and/or based on overcharging.*** We begin with two observations: 1) the R&D and G&A services fees that Ginkgo charges these 'customers' and books as revenue and/or deferred revenue bears no plausible relationship to their size, suggesting they are fraudulent; 2) the timing of when Ginkgo books revenue and/or deferred revenue is equally implausible, sometimes before the entities even appear to have any employees or be functional, which further indicates they are simply sham transactions. For example, LinkedIn indicates only 6 employees at Allonnia LLC, yet Ginkgo records a $38MM deferred revenue balance, on top of booking $5MM of revenue from Allonnia in 2020 and $2.3MM in Q1 2021 – a $9MM annual run rate.

108.    On this news, the price of Ginkgo's common stock declined 11.6% to close at $10.59 per share on October 6, 2021.

109.    In Ginkgo's quarterly report filed on Form 10-Q with the SEC on November 15, 2021, the Company reported that it had received an inquiry from the United Stated Department of Justice related to the allegations in the Scorpion Report.

***Harm to the Company***

110.    As a direct and proximate result of the Ginkgo Defendants' misconduct outlined herein, the Company has lost and expended, and will continue to lose and expend, millions of dollars.

111.    These costs include, *inter alia*: (i) legal fees in connection with the Securities Class Action, including attorneys', accountants', experts', and investigators' fees; (ii) costs to implement measures to remedy the material weaknesses in Ginkgo's internal controls over financial reporting; and (iii) substantial compensation and benefits paid to the Individual Defendants, who breached their fiduciary duties to the Company.

112.    As a direct and proximate result of the Ginkgo Defendants' misconduct and breach of fiduciary duties, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a liar's discount regarding Ginkgo's stock in the future.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

113.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Ginkgo Defendants.

114.    Ginkgo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

115.    Plaintiff is a current shareholder of Ginkgo and was a continuous shareholder of the Company during the period of the Ginkgo Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

116.    At the time this action was commenced, the nine-member Board was comprised of Defendants Kelly, Shetty, Dekkers, Henry, Sankar, Sloan, Belldegrun, and Kewalramani (collectively, the "Director Defendants"), as well as Kathy Hopinkah Hannan, who is not a party to this action.

117.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

118.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

119.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

120.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

121.    Nevertheless, on October 5, 2023, Plaintiff, through his counsel, made the Litigation Demand on the Board to investigate and remedy the violations of law described herein. *See* Exhibit A.  The Litigation Demand states *inter alia*:

> Stockholder demands that the Board take all necessary steps to investigate, address, and promptly remedy the harm inflicted upon Ginkgo as a result of the misconduct (including the Misclassification Misconduct) described herein and in the Complaint.  Specifically, Stockholder demands that the Board investigate the circumstances surrounding the Company's false and misleading statements and violations of all applicable laws, rules, and regulations.  The Board must undertake an investigation of the wrongdoing detailed herein and in the Complaint by independent and disinterested directors with the assistance of independent outside legal counsel.  The investigation should be sufficient to determine:
>
> (a) which current or former Ginkgo employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's failure to comply with applicable laws;
> (b) which current or former Ginkgo employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's false and misleading statements;
> (c) which current or former Ginkgo employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in oversight of all of the forgoing;
> (d) the extent to which the current or former Ginkgo employees, officers, directors, and/or agents benefited as a result of the breaches of fiduciary duty owed to the Company and its stockholders; and

(e) the extent to which Ginkgo was damaged by all of the foregoing.

Following the investigation, Stockholder demands that Ginkgo commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct described above and in the Complaint. The legal proceedings should bring claims for breaches of fiduciary duty and violations of the Exchange Act, among other relevant and appropriate claims. The legal proceedings should also seek recovery of the salaries, bonuses, director remuneration, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. The Board should secure tolling agreements from all potential defendants, which will allow the Board to complete its investigation and pursue all appropriate legal remedies. To the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or obtaining tolling agreements, the Board must investigate and pursue claims for breaches of fiduciary duties and/or legal malpractice against those who allowed any statute of limitations periods to expire. Finally, the Board must take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Ginkgo from committing future wrongful and wasteful acts. Moreover, any future resolutions to the Company's Articles of Incorporation or Bylaws should be put to a stockholder vote, and the following actions may be necessary to ensure proper corporate governance policies, among others:

(a) a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

(b) a proposal to strengthen the Company's disclosure controls; and

(c) a provision to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board.

122. On October 13, 2023, Tyler S. Clarkson, VP, Deputy General Counsel at Ginkgo, responded to the Litigation Demand by letter, stating "The Board of Directors of Ginkgo Bioworks Holdings, Inc. ("Ginkgo") has received your letter dated October 5, 2023. ***The Board will consider your letter in due course***. In the interim, please provide evidence of your client's stock ownership at present and at the time of the events discussed in your letter." (the "Response Letter"). The Response Letter, attached hereto as Exhibit B, constitutes a rejection or refusal of the Litigation Demand.

123. Upon receiving the Litigation Demand, the Board had an affirmative duty under Delaware law to conduct a good faith, reasonable, and objective investigation into the allegations in the Litigation Demand and to reach a good faith, reasonable, and objective conclusion

regarding the potential claims detailed in the Litigation Demand.

124. However, to date, the Board has failed to undertake any of the actions detailed in the Litigation Demand in indefinite deference to other litigation.

125. The only possible conclusion is that the Board acted in bad faith and in breach of its fiduciary duties in refusing to investigate and consider the Litigation Demand, and in fact has intended to reject the Litigation Demand from the outset.

126. Because the Board has constructively and wrongfully refused the Litigation Demand, Plaintiff now commences this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused Gingko.

127. Prosecution of this action, independent of the current Board, is in the best interest of the Company.

128. The wrongful acts complained of herein subject, and will continue to subject, Gingko to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

### **COUNT I**
**Against the SRNG Defendants for Violations of § Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9)**

129. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130. Plaintiff brings this count on behalf of himself as a shareholder eligible to vote on the proposed merger and business combination of SRNG and Ginkgo.

131. Plaintiff asserts solely negligence claims in this count, which is brought within the applicable statute of limitations.

132. The Proxy successfully solicited shareholders to approve the Merger. The Proxy stated that with respect to Motif FoodWorks, it "represented more than 10% of our total revenue" but that Ginkgo "is not the primary beneficiary of [Motif FoodWorks]" because Ginkgo does not have "the power to control . . . the most significant activities of Motif," including its "development

activities." This statement was materially false and misleading and omitted to state facts necessary to make the statement not misleading because it failed to disclose that Ginkgo did in fact exercise control over Motif FoodWorks including over its development activities because its development activities were conducted by Ginkgo in Ginkgo facilities and under the direction and management of Ginkgo executives Kelly and Kakoyiannis.

133.   These representations in the Proxy were materially false and misleading, and/or omitted material facts to make the statements not misleading, when issued. Accordingly, the Proxy's representations that the terms of the Merger were "is fair to and in the best interests of SRNG and its stockholders, and recommending that stockholders vote in favor of the Merger, were materially false and misleading.

134.   Plaintiff, who was entitled to vote on the Merger and held his shares through the close of the Merger, was damaged as a direct and proximate result of the untrue statements of material facts and/or the omission of material facts in the Proxy.

135.   The SRNG Defendants negligently issued, or caused to be issued, false and misleading statements of material facts, or omitted material facts required to be stated for the statements contained in the vote solicitations to be not misleading, and failed to update the Proxy statements with material information which surfaced after the dissemination of the materially misleading statements, and/or omissions, prior to the shareholder September 16, 2021 vote.

136.   The SRNG Defendants thereby violated § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

## COUNT II
### Against the Ginkgo Defendants for Breach of Fiduciary Duty

137.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.   The Ginkgo Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Ginkgo Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

139.   The Ginkgo Defendants violated and breached their fiduciary duties of care,

1  loyalty, reasonable inquiry, and good faith.

2  140.    The Ginkgo Defendants engaged in a sustained and systematic failure to properly

3  exercise their fiduciary duties.  Among other things, the Ginkgo Defendants breached their

4  fiduciary duties of loyalty and good faith by allowing or permitting false and misleading

5  statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise

6  failing to ensure that adequate internal controls were in place regarding the serious business

7  reporting issues and deficiencies described above.  These actions could not have been a good faith

8  exercise of prudent business judgment to protect and promote the Company's corporate interests.

9  141.    As a direct and proximate result of the Ginkgo Defendants' failure to fulfill their

10  fiduciary obligations, the Company has sustained significant damages.

11  142.    As a result of the misconduct alleged herein, the Ginkgo Defendants are liable to

12  the Company.  As a direct and proximate result of the Ginkgo Defendants' breach of their

13  fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

14  image and goodwill.  Such damage includes, among other things, costs incurred in defending

15  itself in the Securities Class Action, exposing the Company to millions of dollars in potential

16  class-wide damages in the Securities Class Action, and damage to the share price of the

17  Company's stock, resulting in an increased cost of capital, and reputational harm.

18

19  **COUNT III**
**Against the Ginkgo Defendants for Aiding and**
20  **Abetting Breach of Fiduciary Duty**

21  143.    Plaintiff incorporates by reference and realleges each and every allegation

22  contained above, as though fully set forth herein.

23  144.    By encouraging and accomplishing the illegal and improper transactions alleged

24  herein and concealing them from the public, the Ginkgo Defendants have each encouraged,

25  facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual

26  Defendants have each aided and abetted, conspired, and schemed with one another to breach their

27  fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal

28  conduct complained of herein.

145.    Plaintiff on behalf of Ginkgo has no adequate remedy at law.

## COUNT IV
### Against the Ginkgo Defendants for Unjust Enrichment

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ginkgo.

148.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Ginkgo that were tied to the performance or artificially inflated valuation of Ginkgo, or received compensation that was unjust in light of the Ginkgo Defendants' bad faith conduct.

149.    Plaintiff, as a shareholder and a representative of Ginkgo, seeks restitution from the Ginkgo Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Ginkgo Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

150.    Plaintiff on behalf of Ginkgo has no adequate remedy at law.

## COUNT V
### Against the Ginkgo Defendants for Abuse of Control

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    The Ginkgo Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

153.    As a direct and proximate cause of the Ginkgo Defendants' abuse of control, the Company has sustained substantial damages.

154.    Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VI
### Against the Ginkgo Defendants for Gross Mismanagement

155.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.    The Ginkgo Defendants, either directly or through aiding and abetting, failed to reasonably exercise their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the expectations and operations of a publicly held corporation.

157.    As a direct and proximate result of the Ginkgo Defendants' gross mismanagement alleged herein, the Company has sustained and will continue to sustain substantial damages.

158.    Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VII
### Against the Individual Defendants for Waste of Corporate Assets

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

161.    As a result of the misconduct described above, the Ginkgo Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

162.    As a result of the waste of corporate assets, the Ginkgo Defendants are liable to the Company.

163.    Plaintiff on behalf Ginkgo has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

-34-

1  for all losses and damages suffered as a result of the acts and transactions complained of herein,
2  together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do
3  not participate therein or benefit thereby;

4        B.    Directing all Ginkgo Defendants to account for all damages caused by them and
5  all profits and special benefits and unjust enrichment they have obtained as a result of their
6  unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock
7  sale proceeds, and imposing a constructive trust thereon;

8        C.    Awarding punitive damages;

9        D.    Awarding costs and disbursements of this action, including reasonable attorneys'
10  fees, accountants' and experts' fees, costs, and expenses; and

11        E.    Granting such other and further relief as the Court deems just and proper.

12  **JURY DEMAND**

13      Plaintiff hereby demands a trial by jury.

14
15  Dated: October 19, 2023        **WOLF HALDENSTEIN ADLER**
                                 **FREEMAN & HERZ LLP**

16
17                  By:   */s/ Rachele R. Byrd*
                        RACHELE R. BYRD
18                          BETSY C. MANIFOLD (182450)
                        RACHELE R. BYRD (190634)
19                          ALEX J. TRAMONTANO (276666)
                        FERDEZA ZEKIRI (335507)
20                          750 B Street, Suite 1820
                        San Diego, CA 92101
21                          Telephone: 619/239-4599
                        Facsimile: 619/234-4599
22                          manifold@whafh.com
                        byrd@whafh.com
23                          tramontano@whafh.com
                        zekiri@whafh.com

24                          Timothy J. MacFall
25                          Gina M. Serra
                        Vincent A. Licata
26                          Samir Aougab
                        **RIGRODSKY LAW, P.A.**
27                          825 East Gate Boulevard, Suite 300
                        Garden City, NY 11530
28                          Telephone: (516) 683-3516
                        tjm@rl-legal.com

gms@rl-legal.com
vl@rl-legal.com
sa@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

30124

## **VERIFICATION**

I, Eric Bowers, have reviewed the allegation made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true, I further declare that I am a current holder, and have been a holder, of Ginkgo Bioworks Holdings, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of October 2023.

10/17/2023

DocuSigned by:

*Eric Bowers*

8A4E2B03D4334FB...

Eric Bowers