BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
Email:        fbottini@bottinilaw.com
              achang@bottinilaw.com

*Counsel for Plaintiff Weining Hu*

[Additional counsel listed on signature page.]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| WEINING HU, derivatively on behalf of GINKGO BIOWORKS HOLDINGS, INC., a Delaware corporation,<br><br>                              Plaintiff,<br><br>                    vs.<br><br>ELI BAKER, *et al.*,<br><br>                              Defendants,<br><br>                    - and -<br><br>GINKGO BIOWORKS HOLDINGS, INC.,<br><br>                    Nominal Defendant. | Case No. 4:23-cv-2077-KAW<br><br>**Plaintiffs' Notice of Motion and Unopposed Motion for Preliminary Approval of Settlement; Memorandum of Points and Authorities in Support Thereof**<br><br>Judge:       Hon. Kandis A. Westmore<br>Courtroom:   4<br>Date:        August 7, 2025<br>Time:        1:30 p.m. |
| ERIC BOWERS, Derivatively on behalf of Nominal Defendant GINKGO BIOWORKS HOLDINGS, INC.,<br><br>                              Plaintiff,<br><br>                    vs.<br><br>JASON KELLY, *et al.*,<br><br>                              Defendants,<br><br>                    - and -<br><br>GINKGO BIOWORKS HOLDINGS, INC.,<br><br>                    Nominal Defendant. | Case No. 4:23-cv-5396-KAW<br><br>Judge:       Hon. Kandis A. Westmore<br>Courtroom:   4<br>Date:        August 7, 2025<br>Time:        1:30 p.m. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on August 7, 2025, at 1:30 p.m., or as soon thereafter as this matter may be heard, plaintiffs Weining Hu and Eric Bowers in the above-captioned actions will and hereby do move this Court, before the Honorable Kandis A. Westmore, in Courtroom 4 of the Ronald V. Dellums Federal Building & United States Courthouse, located at 1301 Clay Street, Oakland, California 94612, for an order:

- preliminarily approving the proposed Settlement,[1] which will resolve the above-captioned derivative actions ("the Federal Derivative Actions") brought on behalf of Ginkgo Bioworks Holdings Inc. ("Ginkgo") and a related consolidated derivative action pending in the Court of Chancery of the State of Delaware captioned *In re Ginkgo Bioworks Holdings, Inc., Stockholder Derivative Litigation*, C.A. No. 2024-0361-KSJM (Del. Ch.);

- approving the proposed form and manner of notice to Current Ginkgo Stockholders;

- scheduling the Settlement Hearing to determine whether to finally approve the proposed Settlement and the agreed-upon Fee and Expense Amount and Service Awards; and

- granting such other and further relief as the Court deems just and proper.

This motion is unopposed.

The motion is based upon (1) this notice of motion and motion; (2) the accompanying memorandum of points and authorities; (3) the Declaration of Francis A. Bottini, Jr., together with its exhibits; and (4) all other records and proceedings before this Court.

---

[1] Unless otherwise noted, all capitalized terms have the same definition as set forth in the Stipulation and Agreement of Settlement dated May 27, 2025 (the "Stipulation"), which is attached as Exhibit 1 to the Declaration of Francis A. Bottini, Jr in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement (cited as "Bottini Decl."). All emphases are added, and internal quotation marks and citations are omitted.

# MEMORANDUM OF POINTS AND AUTHORITIES

## Table of Contents

I.  STATEMENT OF ISSUES TO BE DECIDED ................................................. 1

II.  INTRODUCTION .................................................................................. 1

III.  BACKGROUND .................................................................................... 3

    A.  The Derivative Claims ..................................................................... 3

    B.  Procedural Background .................................................................... 5

        1.  The Federal Derivative Actions ............................................... 5

        2.  The Delaware Chancery Action ............................................... 6

    C.  Mediation and Settlement ................................................................ 7

IV.  TERMS OF THE PROPOSED SETTLEMENT ....................................... 8

V.  LEGAL STANDARD ............................................................................. 9

VI.  ARGUMENT ........................................................................................ 11

    A.  The Court Should Grant Preliminary Approval of the Settlement ............ 11

        1.  The Settlement is the Product of Arm's-Length Negotiations ........ 11

        2.  The Settlement is Well Within the Range of Possible Approval ................................................................................. 15

        3.  The Risks and Expenses of Protracted Litigation Support Settlement ...................................................................... 18

    B.  The Court Should Approve the Proposed Notice to Shareholders ............. 20

    C.  The Court Should Adopt the Proposed Schedule of Events in Anticipation of the Motion for Final Approval ............................................ 22

VII.  CONCLUSION ..................................................................................... 23

# Table of Authorities

## Cases

*Alberto v. GMRI, Inc.,*
    252 F.R.D. 652 (E.D. Cal. 2008) ................................................................. 10

*Arace v. Thompson,*
    2011 WL 3627716 (S.D.N.Y Aug. 17, 2011) ............................................... 21

*Arnaud van der Gracht de Rommerswael v. Auerbach,*
    2019 WL 7753447 (C.D. Cal. Jan. 7, 2019) ................................................ 11

*Brooks v. Am. Exp. Indus., Inc.,*
    1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977) .............................. 14

*Clark v. Ecolab Inc.,*
    2010 WL 1948198 (S.D.N.Y. May 11, 2010) ............................................... 11

*Cohn v. Nelson,*
    375 F. Supp. 2d 844 (E.D. Mo. 2005) ............................................... 17, 18, 19

*D'Amato v. Deutsche Bank,*
    236 F.3d 78 (2d Cir. 2001) .......................................................................... 14

*Griffin v. Consol. Commc'ns,*
    2023 U.S. Dist. LEXIS 98743 (E.D. Cal. June 5, 2023) ............................... 14

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ..................................................................... 10

*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.,*
    2010 WL 4027632 (S.D. Cal. Oct. 14, 2010) .............................................. 14

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) .................................................................................... 11

*Ingram v. The Coca-Cola Co.,*
    200 F.R.D. 685 (N.D. Ga. 2001) .................................................................. 11

*In re Apple Computer, Inc. Derivative Litig.,*
    2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008) ............................. 17

*In re Apple Inc. Device Performance Litig.,*
    2021 U.S. Dist. LEXIS 50550 (N.D. Cal. Mar. 17, 2021) ............................. 14

*In re Austrian & German Bank Holocaust Litig.,*
    80 F. Supp. 2d 164 (S.D.N.Y. 2000) ............................................................ 11

*In re Chickie's & Pete's Wage & Hour Litig.,*
    2014 WL 911718 (E.D. Pa. Mar. 7, 2014) ................................................... 15

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.,*
    1992 U.S. Dist. LEXIS 14337 (C.D. Cal. June 10, 1992) ............................. 11

iii
Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement
Case Nos. 4:23-cv-2077-KAW; 4:23-cv-5396-KAW

*In re Hewlett-Packard Co. S'holder Derivative Litig.,*
  716 F. App'x 603 (9th Cir. 2017) ................................................................15

*In re Lyft, Inc. Derivative Litig.,*
  2024 WL 4505474 (N.D. Cal. Oct. 16, 2024) ............................................21

*In re NVIDIA Corp. Derivative Litig.,*
  2008 U.S. Dist. LEXIS 117351 (N.D. Cal. Dec. 19, 2008) .........................10

*In re OSI Sys., Inc. Derivative Litig.,*
  2017 U.S. Dist. LEXIS 221033 (C.D. Cal. May 2, 2017) .....................15, 19

*In re Pac. Enters. Sec. Litig.,*
  47 F.3d 373 (9th Cir. 1995) .....................................................9, 11, 19, 20

*In re Pinterest Derivative Litig.,*
  2022 U.S. Dist. LEXIS 103528 (N.D. Cal. June 9, 2022) ..........................15

*In re Xoma Corp. Sec. Litig.,*
  1992 U.S. Dist. LEXIS 10502 (N.D. Cal. July 10, 1992) ...........................10

*Johnson v. Hui,*
  752 F. Supp. 909 (N.D. Cal. 1990) .............................................................19

*Kamen v. Kemper Fin. Servs. Inc.,*
  500 U.S. 90 (1991) ......................................................................................19

*Mannato SunTrust Banks, Inc. v. Wells,*
  2013 U.S. Dist. LEXIS 193251 (N.D. Ga. May 6, 2013) ...........................21

*Mills v. Elec. Auto-Lite Co.,*
  396 U.S. 375 (1970) ...................................................................................16

*Mullane v. Cent. Hanover Bank & Trust Co.,*
  339 U.S. 306 (1950) ...................................................................................21

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
  221 F.R.D. 523 (C.D. Cal. 2004) ...............................................................10

*Officers for Justice v. Civil Serv. Comm'n of S.F.,*
  688 F.2d 615 (9th Cir. 1982) ...........................................................9, 10, 18

*Rodriguez v. West Publ'g Corp.,*
  563 F.3d 948 (9th Cir. 2009) ......................................................................11

*Satchell v. Fed. Express Corp.,*
  2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ............................................15

*True v. Am. Honda Motor Co., Inc.,*
  2009 U.S. Dist. LEXIS 29814 (C.D. Cal. Mar. 25, 2009) .....................10, 18

*Unite Nat'l Ret. Fund v. Watts,*
  2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 27, 2005) ...............................16

*United States v. McInnes,*
    556 F.2d 436 (9th Cir. 1977) ................................................. 9

*Villanueva v. Morpho Detection, Inc.,*
    2015 WL 4760464 (N.D. Cal. Aug. 12, 2015) ............................. 11

*Williams v. First Nat'l Bank,*
    216 U.S. 582 (1910) ............................................................ 9

*Zapata Corp. v. Maldonado,*
    430 A.2d 779 (Del. 1981) ...............................................14, 19, 20

**Statutes**

15 U.S.C. § 78n ...................................................................... 5

8 DEL. C. § 220 .................................................................6, 12

**Rules**

FED. R. CIV. P. 23.1 ........................................................ 10, 19, 21

**Treatises**

MANUAL FOR COMPLEX LITIGATION, § 13.14 (4th ed. 2004) ................................. 10

MANUAL FOR COMPLEX LITIGATION, § 21.632 (4th ed. 2004) ............................. 10

## I.     STATEMENT OF ISSUES TO BE DECIDED

1.     Whether the Court should preliminarily approve the Settlement based on a finding that its terms fall within the range of possible approval as fair, reasonable, and adequate.

2.     Whether the Court should approve the proposed form and manner of notice of the Settlement to Current Ginkgo Shareholders as meeting due process standards.

## II.     INTRODUCTION

Plaintiffs Weining Hu and Eric Bowers in the above-captioned actions (the "Federal Derivative Actions") respectfully submit this memorandum in support of their unopposed motion for (1) preliminary approval of the proposed Settlement of the shareholder derivative claims, brought on behalf of Nominal Defendant Ginkgo Bioworks Holdings, Inc. ("Gingko" or the "Company"), in this Court and in the Court of Chancery of the State of Delaware;[2] and (2) entry of the [Proposed] Order Preliminarily Approving Settlement and Providing for Notice (the "Preliminary Approval Order") submitted herewith.[3]

The Settlement is the product of extensive, arm's-length negotiations between experienced, well-informed counsel, with the assistance of Michelle Yoshida, Esq. of Phillips ADR Enterprises (the "Mediator"), a nationally recognized mediator with extensive experience mediating complex shareholder disputes similar to the Derivative Actions.[4]  *See* Bottini Decl.

---

[2] Upon Court approval, the Settlement will fully resolve all derivative claims asserted in the Federal Derivative Actions, as well as *Newman v. Eagle Equity Partners III, LLC*, C.A. No. 2024-0361 (Del. Ch.) (the "*Newman* Action"), filed by Plaintiff Dylan Newman, and *Moskowitz v. Kelly*, C.A. No. 2024-0401 (Del. Ch.) (the "*Moskowitz* Action"), filed by Plaintiff Shlomo Moskowitz.  The *Newman* Action and the *Moskowitz* Action are consolidated and collectively referred to as the "Delaware Chancery Action."  The Federal Derivative Actions and the Delaware Chancery Action are collectively referred to as the "Derivative Actions."  Hu, Bowers, Newman, and Moskowitz are collectively referred to as "Plaintiffs."

[3] The Preliminary Approval Order is submitted as Exhibit A to the Stipulation and Agreement of Settlement (the "Stipulation").  All terms defined in this motion have the same meaning with all terms defined in the Stipulation.

[4] Ms. Yoshida also served as mediator in the securities class action captioned *Bernstein v. Ginkgo Bioworks Holdings, Inc., et al.*, C.A. No. 4:21-cv-08943-KAW, in this Court (the "Securities Action").

---

**1**

¶ 3. Pursuant to the Settlement terms, (1) the Individual Defendants will cause their Insurers to pay Ginkgo $4,125,000 (the "Settlement Amount"); (2) the Company will terminate the contract through which it has historically incubated new operating companies or "OpCos" via a third-party service provider (the "Contract Termination"), which Ginkgo acknowledges and agrees has a value to the Company, in the form of savings of fees under the contract and other associated costs savings over at least the next three (3) years, of $3–4 million; and (3) the Board shall adopt, implement, and maintain for a period of not less than three years the material corporate governance, oversight, and internal controls Reforms set forth in the Stipulation. *Id.* ¶ 4; Stipulation ¶¶ 2.1–2.5. The Settling Parties acknowledge and agree that Plaintiffs' litigation and settlement efforts in the Derivative Actions caused the payment of the Settlement Amount and the Contract Termination and were a substantial factor in the Ginkgo Board's agreement to adopt and maintain the Reforms. Stipulation ¶¶ 2.3–2.4.

Ginkgo's Board, including its independent, non-defendant directors, in a good-faith exercise of business judgment, has determined that: (i) the Settlement confers a substantial benefit upon Ginkgo and its stockholders; and (ii) the Settlement, and each of its terms, is in all respects fair, adequate, reasonable, and in the best interests of Ginkgo and its stockholders.

The Settlement confers these substantial benefits upon Gingko and its stockholders without the risks and expenses of further litigation and is an outstanding resolution for Gingko of cases involving substantial complexity and cost. In agreeing to the Settlement, Plaintiffs have primarily taken into account the substantial $4,125,000 recovery and the benefit to Gingko and its stockholders from the implementation and maintenance of the material Reforms and the Contract Termination, as well as practical considerations associated with litigation risk, such as the time and expense necessary to prosecute the Derivative Actions through trial, post-trial motions, and likely further appeals, and the uncertainties in predicting the outcome of risky, complex litigation. Bottini Decl. ¶ 7.

///

///

In determining whether preliminary approval is warranted, the Court need only conclude that the Settlement is within the range of what might be found to be fair, reasonable, and adequate, such that notice of the Settlement should be provided to Ginkgo's shareholders and the Settlement Hearing be scheduled. The Settlement easily meets this standard.

Accordingly, the Court should grant this unopposed motion.

## III.    BACKGROUND

### A.    The Derivative Claims[5]

Ginkgo is an early-stage company that claimed to have developed a platform for cell programming which would enable the biological production of a diverse range of synthetic products. Ginkgo came to exist in its current form when its predecessor, Soaring Eagle Acquisition Corp. ("Soaring Eagle"), a special purpose acquisition corporation ("SPAC"), acquired a private company, Ginkgo Bioworks, Inc. ("Legacy Ginkgo"), with Legacy Ginkgo becoming a subsidiary of the Company (the "Merger"). *Bowers* Compl. ¶¶ 2, 5–6.

In the Derivative Actions, Plaintiffs asserted claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duty, the aiding and abetting thereof, and related stockholder causes of action under Delaware law against the Individual Defendants – directors, officers, or controlling shareholders of Gingko and Soaring Eagle – in connection with, *inter alia*, the Individual Defendants' (i) alleged material misstatements and omissions about the Company's revenue and sources of revenue; and (ii) other alleged misconduct in connection with the Merger that formed Ginkgo. *Hu* Compl. ¶¶ 47–99.

Defendants Eagle Equity Partners III, LLC (the "Sponsor"), Sloan, Baker, Delman, Kazam, Lee, Miller, Paul, and Leiweke (collectively, the "Soaring Eagle Defendants") are all former directors, officers, or controlling shareholders of Soaring Eagle. Plaintiffs alleged that the Soaring Eagle Defendants owed Soaring Eagle a fiduciary duty to place the Company's best

---

[5] Paragraph references are to either the *Bowers* Verified Shareholder Derivative Complaint (Dkt. No. 1) ("*Bowers* Compl."), the *Hu* Verified Shareholder Derivative Complaint (Dkt. No. 1) ("*Hu* Compl."), or the Amended Verified Shareholder Derivative Complaint in the Delaware Chancery Action ("Chancery Compl.").

interests ahead of their own.  Chancery Compl. ¶¶ 11, 13, 109.

According to Plaintiffs, the Soaring Eagle Defendants conducted one of the largest SPAC initial public offerings on February 26, 2021, when they took Soaring Eagle public, selling over 172 million units and raising over $1.7 billion (the "IPO").  *Bowers* Compl. ¶ 5.  Prior to Soaring Eagle's IPO, the Sponsor paid $25,000 for 43.125 million Soaring Eagle "Founder Shares," roughly $0.0006 per share.  *Hu* Compl. ¶ 185. The Founder Shares would only become freely tradable in the event Soaring Eagle entered into a "business combination" within 24 months of the IPO.  *Bowers* Compl. ¶¶ 65–66. In the business combination, the Founder Shares would convert to Class A common stock on a one-for-one basis and become freely tradable after a short "lockup" period.  Chancery Compl. ¶ 5.  At the time of the Merger, the Founder Shares were worth over $431 million.  *Id.; Hu* Compl. ¶ 186.  If Soaring Eagle did not complete a transaction within 24 months, the Founder Shares would expire as worthless and Soaring Eagle would have to pay back the IPO investors.  *Bowers* Compl. ¶ 66. In other words, the Soaring Eagle Defendants could only unlock the value associated with their Founder Shares — for which they paid a *de minimis* amount — if a business combination occurred.  Chancery Compl. ¶ 6.  Plaintiffs alleged that the Soaring Eagle directors' interests in the Sponsor, which owned the Founder Shares, created a conflict of interest between them and the Company.  *Id.*

Plaintiffs alleged that the Soaring Eagle Defendants agreed to the Merger that valued Legacy Ginkgo at $15 billion, even though it brought in less than $80 million in revenue while losing over $100 million.  Chancery Compl. ¶¶ 7, 177. The valuation of Legacy Ginkgo was largely based on the projections contained in the Proxy soliciting shareholder approval of the Merger.  *Id.* ¶ 15. These projections claimed that Legacy Ginkgo would have $345 million of unlevered free cash flow in 2021, which would then increase 20x to $7.6 billion by 2025.  *Id.* ¶¶ 15, 111.  According to Plaintiffs, Defendants knew this was impossible. *Id.*

Plaintiffs further alleged that the companies that were utilizing Legacy Ginkgo's platform were actually related parties that were often founded, funded, and staffed by Legacy Ginkgo, its employees, or its key investors, and not "leading multinationals" as Defendants

claimed.  *Bowers* Compl. ¶¶ 73, 97. These "OpCos" often operated out of Ginkgo's own headquarters. *Id.* Defendants, however, held these OpCos out as independent companies despite their obvious overlaps with Legacy Ginkgo. *E.g.*, *Hu* Compl. ¶¶ 69, 165.  According to Plaintiffs, 72% of Legacy Ginkgo's 2020 revenue and 100% of its deferred revenue came from these related party OpCos.  *Bowers* Compl. ¶ 78.

Plaintiffs alleged that, to complete the Merger, Defendants issued a materially false and misleading Proxy, and that the Proxy made misleading claims about Legacy Ginkgo's value and the adequacy of Legacy Ginkgo's revenue streams and omitted that Legacy Ginkgo's revenues were propped up by a slew of related-party transactions.  *Bowers* Compl. ¶¶ 9, 72, 80–97. As a result of this misleading Proxy, Legacy Ginkgo's shareholders voted in favor of the Merger.  *Hu* Compl. ¶ 128.

**B.    Procedural Background**

**1.    The Federal Derivative Actions**

On April 28, 2023, Hu filed the action styled *Hu v. Baker, et al.*, No. 4:23-cv-02077-KAW, in this Court derivatively on behalf of nominal defendant Ginkgo against certain of the Individual Defendants alleging claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, violations of Section 14(a) of the Exchange Act, unjust enrichment, and contribution and indemnification (the "*Hu* Action").

On October 20, 2023, Bowers filed the action styled *Bowers v. Kelly, et al.*, No. 4:23-cv-05396-KAW, in this Court derivatively on behalf of nominal defendant Ginkgo against certain of the Individual Defendants alleging claims for violations of Section 14(a) of the Exchange Act, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets (the "*Bowers* Action").  Prior to filing his complaint, Bowers made a litigation demand on the Company's Board to investigate and redress the wrongdoing alleged in the Derivative Actions (the "Litigation Demand").

On December 15, 2023, the Court entered a Stipulation and Order staying the *Bowers*

Action pending events in the related Securities Action and subject to certain conditions. On January 29, 2024, the Court entered a similar Stipulation and Order in the *Hu* Action. On February 28, 2024, Hu moved to consolidate the *Hu* Action and the *Bowers* Action. Bowers opposed Hu's motion. On September 13, 2024, the Court denied Hu's motion to consolidate. On January 17, 2025, Defendants moved to dismiss in part and transfer in part both Federal Derivative Actions and filed therewith requests for judicial notice. On February 19, 2025, the Court entered a Stipulation and Order suspending the deadlines in the Federal Derivative Actions to allow the parties to finalize settlement of the Derivative Actions.

### 2.    The Delaware Chancery Action

On April 14, 2023, Newman made a demand to inspect the Company's books and records pursuant to 8 Del. C. § 220 in connection with the misconduct alleged in the Derivative Actions (the "Newman 220 Demand"). Thereafter, pursuant to a confidentiality agreement, the Company produced over four thousand pages of documents to Newman that were responsive to his demand (the "220 Documents"). On April 4, 2024, utilizing the 220 Documents, Newman filed the *Newman* Action derivatively on behalf of nominal defendant Ginkgo against the Individual Defendants alleging claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment.

On July 6, 2023, Moskowitz made a demand to inspect the Company's books and records pursuant to 8 Del. C. § 220 in connection with the misconduct alleged in the Derivative Actions (the "Moskowitz 220 Demand," and with the Newman 220 Demand, the "220 Demands"). Thereafter, pursuant to a confidentiality agreement, the Company produced 220 Documents to Moskowitz that were responsive to his demand. On April 17, 2024, utilizing the 220 Documents, Moskowitz filed the *Moskowitz* Action derivatively on behalf of Ginkgo against certain of the Individual Defendants alleging claims for breach of fiduciary duty, contribution and indemnification, and aiding and abetting breach of fiduciary duty.

///

///

On September 10, 2024, the Delaware Chancery Court granted the parties' stipulation for consolidation of the *Newman* Action and the *Moskowitz* Action, appointing co-lead counsel, and extending the defendants' deadline to respond to the operative complaint. On November 22, 2024, Defendants moved to dismiss the operative complaint in the Delaware Chancery Action and filed an opening brief in support of their motion. On January 17, 2025, plaintiffs in the Delaware Chancery Action filed a verified amended consolidated complaint.

## C. Mediation and Settlement

The Settling Parties, through their counsel, engaged in months of good-faith, arm's-length discussions with regard to the possible settlement of the Derivative Actions. To that end, the Settling Parties agreed to participate in mediation before the Mediator.

On January 30, 2024, plaintiffs in the Federal Derivative Actions participated in a virtual mediation before the Mediator to discuss a possible settlement. Following several calls with the Mediator in the weeks that followed, on March 22, 2024, Bowers provided Ginkgo and the Individual Defendants with a detailed settlement demand.

On September 30, 2024, counsel for Plaintiffs in the Derivative Actions participated in a full-day, in-person mediation session in New York City before the Mediator, along with counsel for Ginkgo and the Individual Defendants. In advance of the mediation, Plaintiffs in the Derivative Actions prepared and submitted a detailed mediation statement and prepared and served a global settlement demand upon Defendants.

While no resolution was reached at the conclusion of either mediation session, progress was made and the Parties continued negotiating a potential settlement thereafter and engaging in frank discussions regarding the strengths and weaknesses of the claims and defenses at issue, with the facilitation and, when necessary, the involvement of the Mediator. The Settling Parties continued to exchange information, documents, and detailed written settlement proposals and counterproposals, debating the merits of the proposals in numerous communications between the Settling Parties' counsel and the Mediator.

///

From January 2024 to February 2025, Plaintiffs' Counsel had numerous discussions with Defendants' counsel and the Mediator regarding settlement issues and to request additional information. On February 8, 2025, the Mediator made a double-blind recommendation concerning the cash component of the Settlement, in the amount of $4,125,000, which the Settling Parties accepted. At the same time, the Settling Parties agreed on the corporate governance reforms to be adopted by the Company in connection with the Settlement (Stipulation ¶ 2.5), as well as the valuable Contract Termination. *Id.* ¶ 2.2.

After reaching agreement on the Settlement Amount, Reforms, and Contract Termination, the Settling Parties negotiated and ultimately agreed upon the amount of attorneys' fees and expenses to be paid to Plaintiffs' counsel, subject to Court approval, in consideration for the substantial benefits conferred upon Ginkgo and Current Ginkgo Stockholders by the Settlement. *Id.,* ¶ 3.1.

## IV.    TERMS OF THE PROPOSED SETTLEMENT

The Settlement puts the Company in a position to recoup significant funds — $4.125 million — from the Individual Defendants, addresses the core concerns raised in the Derivative Actions, and offers Ginkgo and its shareholders the benefit of the substantial and targeted Reforms to be implemented and maintained by Ginkgo for at least three years, including:

- adoption of enhanced oversight and disclosure procedures for related person transactions;

- implementation of enhanced employee training in related person transactions and disclosures;

- enhancement of the Audit Committee of the Ginkgo's Board of Directors (the "Board");

- enhancement of the Disclosure Committee; and

- enhancement of Ginkgo's internal audit and financial oversight functions.

Bottini Decl. ¶ 30; Stipulation ¶ 2.5. In addition, the Company will terminate the contract through which it has historically incubated new operating companies or "OpCos" via a third-

party service provider (*i.e.,* the "Contract Termination").  Bottini Decl. ¶ 30; Stipulation ¶ 2.2. The Settling Parties estimate that the Contract Termination will have a value to Ginkgo in the form of savings of fees under the contract and other associated costs savings over at least the next three years of approximately $3–4 million.

The Settling Parties acknowledge and agree that Plaintiffs' litigation and settlement efforts in the Derivative Actions caused the payment of the Settlement Amount and the Contract Termination and were a substantial factor in the Ginkgo Board's agreement to adopt the Reforms.  Bottini Decl. ¶ 31; Stipulation ¶¶ 2.3–2.4.  The Settling Parties further acknowledge and agree that these Reforms confer substantial benefits on the Company and Current Ginkgo Stockholders and that the Settlement on the terms set forth herein is in all respects fair, reasonable, and adequate, and serves the best interests of the Company and Current Ginkgo Stockholders, supporting preliminary, and ultimately final, approval of the Settlement.  Stipulation ¶ 2.4.

After agreeing upon the principal terms of the Settlement, the Settling Parties negotiated a fair and reasonable amount for attorneys' fees and reimbursement of expenses, agreeing upon the $2,750,000 Fee and Expense Amount to Plaintiffs' counsel (subject to Court approval) in recognition of the substantial benefits provided to Ginkgo as a result of the prosecution and Settlement of the Derivative Actions.  Bottini Decl. ¶ 32; Stipulation ¶ 3.1.[6]

## V.    LEGAL STANDARD

It is well-settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank,* 216 U.S. 582, 595 (1910); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Officers for Justice v. Civil Serv. Comm'n of S.F.,* 688 F.2d 615, 635 (9th Cir. 1982) (recognizing that the "settlement process [is] favored in the law"); *United States v. McInnes,* 556 F.2d 436, 441 (9th Cir. 1977) ("there is an overriding public interest in settling and quieting litigation").  Settlements are particularly favored "'in class actions and other

---

[6] The Court is not asked to evaluate the agreed Fee and Expense Amount at the preliminary approval stage; that question is generally reserved for final settlement approval proceedings.

complex cases [such as derivative actions] where substantial judicial resources can be conserved by avoiding formal litigation.'" *In re NVIDIA Corp. Derivative Litig.,* 2008 U.S. Dist. LEXIS 117351, at *7 (N.D. Cal. Dec. 19, 2008); *see also In re Xoma Corp. Sec. Litig.,* 1992 U.S. Dist. LEXIS 10502, at **3–4 (N.D. Cal. July 10, 1992) ("The law favors settlement of cases and quieting of litigation, particularly in complex class actions and derivative litigation.").

Rule 23.1(c) requires the Court to approve any settlement, voluntary dismissal, or compromise of the claims by the parties.  "Review of a proposed settlement generally proceeds in two stages": preliminary approval and final approval.  *True v. Am. Honda Motor Co., Inc.,* 2009 U.S. Dist. LEXIS 29814, at **8–9 (C.D. Cal. Mar. 25, 2009) (citing MANUAL FOR COMPLEX LITIGATION, § 21.632 (4th ed. 2004) ("MANUAL")).    At this time, the Court need only preliminarily approve the Settlement by "conduct[ing] a cursory review of the terms of the parties' settlement for the purposes of resolving any glaring deficiencies" before authorizing dissemination of the Notice.  *Alberto v. GMRI, Inc.,* 252 F.R.D. 652, 665 (E.D. Cal. 2008) (granting preliminary approval of settlement).  Indeed, at the preliminary approval stage, the Court's review of the proposed settlement is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Officers for Justice*, 688 F.2d at 625; *accord Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1998).

This is a low threshold, requiring the Court to determine only "whether a proposed settlement is 'within the range of possible approval" and that notice should be given to those affected by the proposed settlement."  *True*, 2009 U.S. Dist. LEXIS 29814, at *9; *see also* MANUAL at § 13.14 ("First, the [court] reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing.  If so, the final decision on approval is made after the hearing.").  A finding that a proposed settlement deserves preliminary approval is merely "the ground work for a future fairness hearing."  *Alberto*, 252 F.R.D. at 659 (citing *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 525 (C.D. Cal. 2004)).

# VI.    ARGUMENT

## A.    The Court Should Grant Preliminary Approval of the Settlement

### 1.    The Settlement is the Product of Arm's-Length Negotiations

Settlements achieved through extensive arm's-length negotiations conducted by experienced, well-informed counsel enjoy a "presumption of fairness." *Villanueva v. Morpho Detection, Inc.*, 2015 WL 4760464, at *6 (N.D. Cal. Aug. 12, 2015); *see Arnaud van der Gracht de Rommerswael v. Auerbach*, 2019 WL 7753447, at *3 (C.D. Cal. Jan. 7, 2019) ("strong presumption of fairness" attached to settlement that "was the product of arms-length negotiations between experienced and well-informed counsel"); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("[w]e put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution").[7]    Significant weight is accorded the parties' belief that the litigation should be settled on the proposed terms, since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Pac. Enters.*, 47 F.3d at 378; *see also In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 1992 U.S. Dist. LEXIS 14337, at *8 (C.D. Cal. June 10, 1992) (counsel's view that settlement served best interests of class compelling factor favoring approval); *Clark v. Ecolab Inc.*, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) ("'[a]bsent fraud or collusion, [courts] should be hesitant to substitute [their] judgment, for that of the parties who negotiated the settlement'") (alterations original).

Here, Plaintiffs' Counsel have thoroughly considered the facts and law underlying the

---

[7] *See also In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000) ("If ... the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex ... litigation, the Settlement will enjoy a presumption of fairness.").  While the Court need not address the agreed Fee and Expense Amount until final approval, it bears mention that courts afford similar deference to arm's-length fee negotiations.  *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (negotiated fees strongly preferred) ("[a] request for attorney's fees should not result in a second major litigation"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (where no evidence of collusion and no detriment to the parties, "the Court should give substantial weight to a negotiated fee amount").

Derivative Actions and have conducted a substantial investigation, including through the production of thousands of pages of documents to Plaintiffs, relating to the claims and the underlying events alleged in the Derivative Actions.    Plaintiffs' Counsel's investigation included, among other things:

- reviewing Ginkgo's press releases, public statements, U.S. Securities and Exchange Commission ("SEC") filings, and securities analysts' reports and advisories about the Company;

- reviewing public filings, media reports, and analyst commentaries about the Company;

- researching the applicable law with respect to the claims asserted in the Derivative Actions and the potential defenses thereto;

- reviewing and analyzing the Company's Corporate Governance Guidelines and Code of Conduct and the charters of all Board committees;

- reviewing and analyzing the pleadings and other papers filed in the Securities Action, and evaluating the merits of, and the Individual Defendants' liability in connection with, the Securities Action and the Derivative Actions;

- certain Plaintiffs' preparing and serving the litigation and books and records inspection demands;

- reviewing and evaluating thousands of pages of 220 Documents that were produced in response to certain Plaintiffs' books and records demands pursuant to 8 Del. C. § 220;

- preparing and filing derivative complaints, as well as a consolidated amended complaint in the Delaware Chancery Court;

- reviewing certain Company contracts and the Company's existing corporate governance policies and preparing extensive settlement demands detailing proposed corporate governance reforms to strengthen the Company's internal controls and corporate governance practices;

- conducting damages analyses and preparing extensive mediation statements;

- participating in multiple mediation sessions and substantive, protracted settlement discussions with Defendants' Counsel under the auspices of the Mediator;

- reviewing and analyzing confidential information provided to Plaintiffs' Counsel in the context of mediation; and

- negotiating the Stipulation and exhibits thereto.

Plaintiffs and Plaintiffs' Counsel brought the claims in good faith and continue to believe that the claims asserted in the Derivative Actions have merit.  However, Plaintiffs and Plaintiffs' Counsel recognize and acknowledge the expense, time, and uncertainty inherent in the continued prosecution of their claims in the Derivative Actions through dispositive motion practice, trial(s) and any subsequent appeal(s).  Plaintiffs and Plaintiffs' Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Derivative Actions, as well as the difficulties and delays inherent in such litigation.  Plaintiffs and Plaintiffs' Counsel also are mindful of the inherent problems of proof of, and possible defenses to, the claims asserted in the Derivative Actions.  Based on their investigation and evaluation set forth in more detail *infra*, the Plaintiffs and Plaintiffs' Counsel have determined that the Settlement set forth in this Stipulation is in the best interests of Ginkgo and Current Ginkgo Stockholders.  And based on the thorough investigation and evaluation enumerated above and their collective decades of experience in shareholder derivative litigation, Plaintiffs' Counsel recommend that the Court grant preliminary approval of the Settlement.  *Id.* ¶ 35.

Ginkgo's Board, including its independent, non-defendant directors, in a good-faith exercise of business judgment, likewise has determined that: (i) the Settlement confers a substantial benefit upon Ginkgo and its stockholders; and (ii) the Settlement, and each of its terms, is in all respects fair, adequate, reasonable, and in the best interests of Ginkgo and its stockholders.  Stipulation § I.E.  The Board's decision warrants substantial deference.  *See*

*Brooks v. Am. Exp. Indus., Inc.*, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) ("[T]he decision of the [] board to approve this settlement is appropriately afforded certain deference; it is a business judgment with presumptive validity."); *see generally Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981).

Moreover, the negotiations were structured to eliminate potential conflicts of interest and to ensure fairness.  The Settlement was extensively negotiated among well-informed experienced counsel possessing a firm understanding of the strengths and weaknesses of the claims and defenses asserted, is the product of significant give and take by the Settling Parties, and was reached after extensive negotiations between the Settling Parties and their respective counsel, including multiple mediation sessions and months of post-mediation negotiations facilitated by the Mediator.  *Supra* § III.C; Bottini Decl. ¶ 44; Stipulation § I.B.  *See Griffin v. Consol. Commc'ns*, 2023 U.S. Dist. LEXIS 98743, at **8–9 (E.D. Cal. June 5, 2023) ("Given counsel's representation that the settlement reached was the product of arms-length bargaining following extensive informal discovery and with the help of an experienced mediator, this factor weighs in favor of final approval."). Each of the Settling Parties was represented by zealous and able counsel who negotiated the terms of the Settlement aggressively, in good faith, and at arm's-length.  Bottini Decl.¶ 45; Stipulation ¶ 7.21. Indeed, Ginkgo was represented by experienced counsel at every phase of negotiations facilitated by an experienced private mediator familiar with the relevant law and the specific subject matter, and attorneys' fees were not addressed until the Parties had reached agreement upon the substantive consideration for the Settlement.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement ... helps to ensure that the proceedings were free of collusion"); *In re Apple Inc. Device Performance Litig.*, 2021 U.S. Dist. LEXIS 50550, at *44 (N.D. Cal. Mar. 17, 2021) ("extensive arm's-length negotiations between experienced counsel, including several in-person mediation sessions and additional negotiations facilitated by" mediator rules out collusion); *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, 2010 WL 4027632, at *2 (S.D. Cal. Oct. 14, 2010) ("negotiations for several months ... and the active

involvement of the mediator ... weighs considerably in favor of concluding this is not a collusive settlement"); *Satchell v. Fed. Express Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("assistance of an experienced mediator ... confirms that the settlement is non-collusive"); *In re Chickie's & Pete's Wage & Hour Litig.*, 2014 WL 911718, at *4 (E.D. Pa. Mar. 7, 2014) (no collusion where "the amount of attorneys' fees could not have affected the amount of [p]laintiffs' recovery").

In sum, the Settling Parties engaged in settlement discussions after they thoroughly evaluated the risks of continued litigation and had sufficient information to support the decision regarding the fairness, adequacy, and reasonableness of the Settlement.  Bottini Decl. ¶ 46.

### 2.     The Settlement is Well Within the Range of Possible Approval

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re Pinterest Derivative Litig.*, 2022 U.S. Dist. LEXIS 103528, at *6 (N.D. Cal. June 9, 2022); *In re OSI Sys., Inc. Derivative Litig.*, 2017 U.S. Dist. LEXIS 221033, at **5–6 (C.D. Cal. May 2, 2017).  Courts may weigh a variety of other factors, including: "the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, the amount offered in settlement, the stage of the proceedings, the experience and views of counsel, and the reaction of class members to the proposed settlement." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 605 (9th Cir. 2017).

The Settlement includes a significant financial component of $4.125 million, the Contract Termination with an estimated value of $3–$4 million, and valuable Reforms designed to prevent recurrence of the alleged misconduct and further damage to Ginkgo, and to provide the Board with better information in support of its decision-making processes. Courts have long recognized that a corporation may receive a "substantial benefit" from "corporate therapeutics" that "furnish a benefit to all shareholders by providing an important

means of enforcement of [a corporation's director and officer obligations]" similar to the Reforms negotiated and agreed-to in this Settlement. *See Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 395–96 (1970) ("a corporation may receive a 'substantial benefit' from a [shareholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature," because "'corporate therapeutics' ... furnish a benefit to all shareholders by providing an important means of enforcement of [a corporation's director and officer obligations]") (citation omitted); *see also Unite Nat'l Ret. Fund v. Watts,* 2005 U.S. Dist. LEXIS 26246, at *18 (D.N.J. Oct. 27, 2005) (awarding $9.2 million in fees based on "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement").

The Reforms include enhanced oversight and disclosure procedures for related party transactions, including oversight by Audit Committee members of these transactions. The maintenance of a strong related person transaction policy and procedures will provide clear guidelines for the purposes of oversight and mitigate the risk of conflicts of interest. The Reforms mandate that the directors serving on the Audit Committee satisfy the independence requirements of the New York Stock Exchange and the more rigorous SEC independence standards, ensuring that there will be critical, independent, and effective oversight.

The Audit Committee's new obligations of oversight over the Company's periodic SEC filings coupled with the enhanced duties of the management-level Disclosure Committee will provide additional assurance of the full disclosure of material information regarding the related parties. Indeed, the Reforms require that membership of the Disclosure Committee includes the Company's Chief Financial Officer, General Counsel, and Chief Accounting Officer, signaling the Company's commitment to complete, accurate and timely disclosure by placing these high-level executives at the center of the Company's disclosure oversight and accountability process. The chair of the Disclosure Committee will also provide an at least quarterly update to the Audit Committee regarding any disclosure issues and concerns, further strengthening the coordination between these committees, and ensuring a more integrated and

effective oversight structure.

Included in the Reforms is the development and implementation by the Company's General Counsel of a training program focused on best practices in managing, mitigating, and ensuring proper disclosure of potential conflicts of interest that may arise from the Company and relationships between related persons and related person-affiliated or controlled entities. The training will be provided to all Section 16 reporting officers, ensuring that these key officers will be properly trained to identify potential conflicts of interest and ensure accurate, full, and timely disclosure thereof, insulating the Company from further damage in these areas and mitigating risk exposures.

This comprehensive set of Reforms will make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators or prosecutors." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005). Indeed, the Reforms confer further economic value upon Ginkgo and its stockholders by enacting, among other things, more rigorous, independent, and effective oversight, which will improve corporate decision-making; ensure accurate disclosures; and reduce the costs associated with failure to comply with disclosure and other legal or regulatory requirements. Moreover, the Reforms confer economic value by laying the foundation necessary to enhance investor confidence in the accuracy of the Company's public disclosures, the integrity of its management, and the independence and effectiveness of the Company's corporate governance and Board oversight and monitoring. *See In re Apple Computer, Inc. Derivative Litig.*, 2008 U.S. Dist. LEXIS 108195, at *10 (N.D. Cal. Nov. 5, 2008) (strong corporate governance reforms provide value to a company through increased "market value" and investors who "likely will view such reforms as an additional reason to purchase the stock.").

In sum, the Parties agree that the Reforms provide a substantial benefit to Ginkgo and its stockholders. Stipulation ¶ 2.4. Ginkgo has agreed to maintain the Reforms for a minimum of three years, which provides ample time to ensure that the Reforms become embedded in the

Company's policies, practices, and corporate culture, thus protecting against discontinuation of these Reforms following the three-year period. *Id., see Cohn*, 375 F. Supp. 2d at 850 (finding that corporate governance enhancements committed for at least three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

The results achieved in the Settlement were hard-fought. The Settling Parties reached an agreement on these after multiple mediation sessions overseen by the Mediator and months of extensive subsequent negotiations. *Supra* III.C.; Bottini Decl. ¶ 47. This process demonstrates that the Settlement is "fair, reasonable and adequate to all concerned," and "within the range of possible approval." *Officers for Justice,* 688 F.2d at 625; *True,* 2009 U.S. Dist. LEXIS 29814, at **8–9.

### 3.    The Risks and Expenses of Protracted Litigation Support Settlement

In weighing the Settlement's benefits, courts recognize the limited utility of speculation about the possibility that further litigation might yield a materially better result. "[T]he very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice,* 688 F.2d at 624. "The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* "In assessing the Settlement, this Court must balance the benefits accorded to [the Company] and its stockholders, and the immediacy and certainty of a substantial recovery for them, against the continuing risks of litigation." *See Cohn*, 375 F. Supp. 2d at 855.

Here, the Settlement's guarantee of benefits described herein – namely, the Settlement Amount, Contract Termination, and Reforms – far outweighs the possibility that meaningfully superior benefits might be achieved through further litigation, particularly in light of the substantial costs, delays, and management distractions continued litigation would entail, and the substantial risk that further litigation would forfeit the Settlement's benefits and result in no recovery whatsoever.

Plaintiffs and Plaintiffs' Counsel brought the claims in good faith and continue to believe that the claims asserted in the Derivative Actions have merit. Stipulation § I.C.; Bottini Decl.

¶ 35.  However, Plaintiffs and Plaintiffs' Counsel recognize and acknowledge the expense, time, and uncertainty inherent in the continued prosecution of their claims in the Derivative Actions through dispositive motion practice, trial(s) and any subsequent appeal(s).  *Id.* Plaintiffs and Plaintiffs' Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Derivative Actions, as well as the difficulties and delays inherent in such litigation.  *Id.* Plaintiffs and Plaintiffs' Counsel also are mindful of the inherent problems of proof of, and possible defenses to, the claims asserted in the Derivative Actions.  *Id.*

As the Ninth Circuit observed in affirming the district court's approval of a derivative settlement, "[t]he odds of winning [a] derivative lawsuit [a]re extremely small." *Pac. Enters.*, 47 F.3d at 378; *Cohn*, 375 F. Supp. 2d at 852. The risks begin at the pleadings stage, where demand futility must be pled with particularity as to a majority of Ginkgo's directors. *See* FED. R. CIV. P. 23.1.  The demand futility requirement is satisfied only under "extraordinary conditions[.]" *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96 (1991); *see also OSI Sys.*, 2017 WL 5642304, at *3 (recognizing that adequately alleging demand futility is a "difficult showing" that requires a plaintiff "to overcome several hurdles to show that a majority of the board was either interested or lacked independence").

Even if Plaintiffs succeed in pleading demand futility, the Board "may appoint a special litigation committee" tasked with investigating and determining whether to permit plaintiffs to prosecute the claims or to terminate the litigation. *Johnson v. Hui*, 752 F. Supp. 909, 913–14 (N.D. Cal. 1990); *accord Zapata*, 430 A.2d at 786 ("We do not think that the interest taint of the board majority is per se a legal bar to the delegation of the board's power to an independent committee composed of disinterested board members ... [that may] properly act for the corporation to move to dismiss derivative litigation[.]").

If Plaintiffs defeat the recommendation of a Special Litigation Committee, the challenges remain daunting, including, *inter alia*, (i) building a circumstantial case for liability based upon thousands of complex business and financial documents; (ii) proving actual

damages in a battle of the experts; (iii) overcoming motions for summary adjudication; (iv) securing a favorable judgment at trial through circumstantial evidence comprised of complex corporate documents and the testimony of predominantly hostile percipient witnesses and contested expert testimony; (v) maintaining that judgment through post-trial motions and appeals; and (vi) enforcing any judgment as might be obtained.  These challenges are amplified in shareholder derivative litigation, making it "notoriously difficult and unpredictable." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983); *Pac. Enters.*, 47 F.3d at 378 ("derivative lawsuits are rarely successful"). The pre-trial discovery required to overcome these challenges would be exceedingly costly, complex, and time-consuming, encompassing an enormous volume of documents, depositions of myriad fact witnesses, and preparation of expert reports and expert depositions.  Moreover, each step of the way, the Defendants would continue in their vigorous defense with the assistance of their highly experienced counsel, Wachtell, Lipton, Rosen & Katz and White & Case LLP.

The substantial Settlement Amount, the Contract Termination, and the Settlement's guarantee of the implementation and maintenance of material Reforms with substantial long-term economic value well demonstrate that the Settlement falls within the range of reasonableness and should be preliminarily approved.

**B.    The Court Should Approve the Proposed Notice to Shareholders**

Plaintiffs seek approval of the proposed form and manner of the Notice of Settlement to Current Ginkgo Stockholders, substantially in the form of Exhibits B and C to the Stipulation.

Upon preliminary approval of the Settlement and in accordance with the terms of the Stipulation, Ginkgo has agreed to provide notice to Ginkgo's shareholders by: (i) within ten business days of entry of the Preliminary Approval Order, posting the Long Form Notice and the Stipulation (and exhibits thereto) on the Investor Relations page of Ginkgo's website and maintain the documents there until after the Settlement Hearing;  (ii) within ten business days of the entry of the Preliminary Approval Order, causing the Summary Notice to be disseminated on *GlobeNewswire* or similar wire service, with a link to the Company's Investor

Relations webpage where the Long Form Notice and Stipulation (and exhibits thereto) will be posted and available, and (iii) at least 30 calendar days before the Settlement Hearing, including in a filing with the SEC a disclosure of the Settlement, with a link to the Company's Investor Relations webpage where the Long Form Notice and Stipulation (and exhibits thereto) will be posted and available. Stipulation ¶ 4.1; Bottini Decl. ¶ 49.

The proposed Notice describes in plain English the terms and conditions of the proposed Settlement, including: (1) the facts and considerations that caused the Settling Parties and their respective counsel to conclude that the proposed Settlement is fair, reasonable, adequate and in Ginkgo's best interests; (2) the procedure for objecting to the proposed Settlement; and (3) the date, place, and time of the Settlement Hearing. *See, e.g.,* Ex. B to the Stipulation at 18; Bottini Decl. ¶ 50. The proposed Notice is reasonably calculated to apprise Current Ginkgo Stockholders of the pendency and Settlement of the Derivative Actions and afford them an opportunity to present their objections. Bottini Decl. ¶ 50; *see also Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950) (notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

The use of publication notice, coupled with website posting, has gained broad acceptance in light of the rapid transition of the investment community from a paper-based to a web-based disclosure system. Bottini Decl. ¶ 51. Indeed, the proposed notice program in this case has been used in similar shareholder derivative settlements and approved by courts as meeting due process requirements. *Id.*; *see also, e.g.*, *In re Lyft, Inc. Derivative Litig.,* 2024 WL 4505474, at *7 (N.D. Cal. Oct. 16, 2024) (notice provided by website, newswire, and national publication is sufficient); *Mannato SunTrust Banks, Inc. v. Wells,* 2013 U.S. Dist. LEXIS 193251, at *14 (N.D. Ga. May 6, 2013) (same); *Arace v. Thompson,* 2011 WL 3627716, at *4 (S.D.N.Y Aug. 17, 2011) (same). Accordingly, the Settling Parties request that the Court approve the form and manner of notice as described herein as meeting the requirements of Rule 23.1 and due process standards. Bottini Decl. ¶ 51.

**C.    The Court Should Adopt the Proposed Schedule of Events in Anticipation of the Motion for Final Approval**

In connection with preliminary approval of the Settlement, the Settling Parties request that the Court establish the date by which: (1) notice of the Settlement will be given to Current Ginkgo Stockholders; (2) Current Gingko Shareholders may object to the Settlement; and (3) the Settlement Hearing shall occur.  Plaintiffs propose the following schedule:

| | |
|---|---|
| Ginkgo shall post the Long Form Notice and the Stipulation (and exhibits thereto) on the Investor Relations page of Ginkgo's website and maintain the documents there until after the Settlement Hearing | Within ten business days after entry of the Preliminary Approval Order (the "Notice Date") |
| Ginkgo shall cause the Summary Notice to be disseminated on *GlobeNewswire* or similar wire service, with a link to the Company's Investor Relations webpage where the Long Form Notice and Stipulation (and exhibits thereto) will be posted and available | Within ten business days of the Notice Date |
| Ginkgo shall include in a filing with the SEC a disclosure of the Settlement | At least 30 calendar days before the Settlement Hearing |
| Deadline for opening briefs and supporting documents in support of final approval of the Settlement | At least 21 calendar days before the Settlement Hearing |
| Deadline for Ginkgo shareholders to object to the Settlement | At least 14 calendar days before the Settlement Hearing |
| Deadline for Settling Parties to file papers in support of the Settlement and responses to shareholder objections | At least 7 calendar days before the Settlement Hearing |
| Settlement Hearing | At least 60 days after entry of the Notice Date |

///

///

///

///

## VII.   CONCLUSION

The Settlement achieved — with a $4.125 million recovery, Contract Termination with an estimated value of $3–$4 million, and substantial corporate governance Reforms for Ginkgo and its shareholders — is an excellent result given the risks inherent in the Derivative Actions and the complexity and expense if the Derivative Actions proceeded in litigation and, ultimately, to trial.  Accordingly, the Settlement is fair, reasonable, and adequate and should be preliminarily approved by the Court.

Dated:  May 27, 2025

Respectfully submitted,

BOTTINI & BOTTINI, INC.

*s/ Francis A. Bottini, Jr.*

Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002
Email:        fbottini@bottinilaw.com
                  achang@bottinilaw.com

*Counsel for Plaintiff Weining Hu*

Dated:  May 27, 2025

Respectfully submitted,

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP

*s/ Rachele R. Byrd*

Rachele R. Byrd

Rachele R. Byrd (190634)
Betsy C. Manifold (182450)
Alex J. Tramontano (276666)
Ferdeza Zekiri (335507)
750 B Street, Suite 1820
San Diego, California 92101
Telephone:    (619) 239-4599
Facsimile:     (619) 234-4599
Email:          byrd@whafh.com
                    manifold@whafh.com
                    tramontano@whafh.com
                    zekiri@whafh.com

RIGRODSKY LAW, P.A.
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, New York 11530
Telephone:        (516) 683-3516
Email:             sdr@rl-legal.com
                   tjm@rl-legal.com
                   vl@rl-legal.com

GRABAR LAW OFFICES
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Telephone:        (267) 507-6085
Email:             jgrabar@grabarlaw.com

*Counsel for Plaintiff Eric Bowers*

**Certificate Pursuant to Local Rule 5-1(i)(3)**

I, Francis A. Bottini, Jr., am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

Dated: May 27, 2025

*s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.